STATE OF NEW JERSEY AND DAVID D. FURMAN, ATTORNEY GENERAL OF NEW JERSEY, APPELLANTS, v. NEW JERSEY BELL TELEPHONE COMPANY, ETC., AND DEPARTMENT OF PUBLIC UTILITIES, BOARD OF PUBLIC UTILITY COMMISSIONERS, STATE OF NEW JERSEY, RESPONDENTS.

Argued April 20, 1959—Decided June 1, 1959.

*Mr. David D. Furman,* Attorney General of New Jersey, argued the cause for the appellants (*Mr. Thorn Lord,* attorney appointed to protect the public interest pursuant to *N. J. S. A.* 48:2–31.1, of counsel; *Mr. William L. Boyan,* Deputy Attorney General, on the brief).

Mr. *Duane E. Minard, Jr.,* argued the cause for the respondent, New Jersey Bell Telephone Company (*Messrs. Thomas Glynn Walker* and *Duane E. Minard, Jr.,* attorneys).

Mr. *Eugene Brennan,* Regional Counsel, argued the cause for General Services Administration of the United States of America, *amicus curiae* (*Mr. George Cochran Doub,* Assistant Attorney General, Civil Division; *Mr. John G. Laughlin,* Attorney, Civil Division, of counsel; *Mr. J. H. Macomber, Jr.,* General Counsel; *Mr. Frederick W. Benniston,* Assistant General Counsel; *Mr. Malcolm D. Miller,* Chief Counsel; *Mr. Donegan Mann,* Attorney; *Mr. Clarence J. Koontz,* Attorney).

Mr. *John R. Sailer* argued the cause for Plainfield-Union Water Company, *amicus curiae* (*Mr. William R. Holzapfel,* on the brief).

Mr. *H. Frank Pettit* argued the cause as rate counsel by appointment of the Attorney General in Plainfield-Union Water Co. v. Board of Public Utility Commissioners, as *amicus curiae.*

Mr. *Samuel William Zerman,* attorney for Hackensack Water Company, *amicus curiae* (*Mr. Russell E. Watson,* of counsel).

Mr. *Alfred W. Kiefer,* rate counsel by appointment of the Attorney General in Hackensack Water Company v. Board of Public Utility Commissioners, as *amicus curiae* (*Mr. Christian Bollermann,* on the brief).

The opinion of the court was delivered by

BURLING, J. This is a public utility rate case. On April 26, 1957 the New Jersey Bell Telephone Company filed new rate schedules with the Board of Public Utility Commissioners. The new schedules, which were to become effective on June 1, 1957, were designed to increase annual intrastate revenues by $14,148,000 and income after deduc-

tions of taxes and operating expenses (net income) by $6,444,700.

The Board, pursuant to statutory authority (*R. S.* 48:2–21) entered an order suspending the effective date for increased rates and providing for a public hearing on the question of the justness and reasonableness of the proposed rate increases. The Board held public hearings on 24 days between June 19 and December 2, 1957. On December 30, 1957 it filed its decision and order allowing the company to:

"file tariffs which will produce net additional earnings from operations of $5,657,800 after giving effect to associated costs including Federal Income Tax at 52% and Gross Receipts Tax at 5% as well as consolidated tax savings."

The company was permitted, effective January 1, 1958, to increase basic monthly exchange rates for residential service by 7% and basic monthly exchange rates for business service 11%. Supplemental service charges were increased as proposed in the company's schedule and non-recurring charges, with certain exceptions, were to be raised not more than 25%.

With respect to establishing a rate of return, the Board declared: "That a fair rate of return would be in the range of 6% to 6.37%."

On February 13, 1958 the State and the Attorney General prosecuted an appeal to the Superior Court, Appellate Division. On February 28, the company filed a motion in that court requesting that the cause be remanded to the Board to the end that the Board be permitted to re-examine its decision and order of December 30, 1957. On March 17, 1958 the Appellate Division ordered that the cause be remanded to the Board, the appeal to be retained in that court, pending determination by the Board of the matters presented on remand.

On the remand, supplemental petitions and memorandums were filed by the parties and further hearings were held in

March and April of 1958. One of the major issues on the remand was the Board's determination that the company's rate base was $527,541,000. This figure was arrived at by adding to the 1957 year-end net investment of $502,041,000 (which figure included depreciated original cost of intrastate plant, materials and supplies and property held for future use), the sum of $25,500,000, which the Board found represented the average increase in net plant investment in 1958, the year following the test year. It was argued by the attorneys in the public interest that inclusion of average increase in net investment for 1958 in the end-of-year 1957 rate base was erroneous.

On June 19, 1958 the Board filed its decision and order on remand reaffirming its original finding of a rate base of $527,541,000. The decision and order of December 30, 1957, with certain minor exceptions not here relevant, were reaffirmed. It was found that the operating income which would be earned by the company on an annual basis at the rate allowed would amount to $32,913,900, which figure represented a return of 6.24% on the rate base adopted. This rate of return fell within the Board's determination of the range of fair rate—6% to 6.37%.

Upon return of the appeal to the Superior Court, Appellate Division, while pending therein and prior to argument, this court granted appellants' motion for direct certification, pursuant to *R. R.* 1 :10–1A.

The question on this appeal is whether it was erroneous for the Board to include in the rate base calculated upon the depreciated original cost of plant, *i. e.,* book value, as of December 31, 1957, the sum of 25½ million dollars representing the average 1958 increase in net investment, in order to arrive at a fair value of the company's property.

Preliminarily, it is important to dissect and consider the decision and order of the Board on remand with respect to the 25½ million dollar figure forming the subject matter of the present controversy.

The Board first noted that the primary ingredient of its determination of the rate base was the depreciated original cost of intrastate plant—book value—as of December 31, 1957, which figure, when added to the allowances for cash working capital, materials and supplies and property held for future use, afforded a rate base of $502,041,000. The Board then discussed the item of 25½ million dollars as follows:

"The Board is under a fundamental obligation in a rate proceeding to approve rates that will maintain the integrity of the utility's invested capital. The inflation that has characterized our economy since World War II presents a challenge to the Board in this respect. The nature of the challenge is illustrated by the increased construction and equipment costs of the Company. In 1946 the Company had an average investment per main telephone of $307. By December 31, 1957 this figure had increased to $481, an increase of 57%.

It may fairly be said that this Board has been cautious and conservative in its approach to the problem of inflation. It has been conscious of the reduction in cost levels that characterized the depression of the nineteen-thirties. It should be noted, however, that even the present business downturn or recession has not resulted in lower price levels. Prices have remained firm and indeed, in many areas, have continued their upward tendency.

It is true of course, that large inflationary increases in capital investment are reflected in the rate base, and eventually in higher rates. But there is a substantial delay between the time that the increased costs are incurred and the time that they are reflected in higher rates. Other factors being equal, in a period of continually rising prices this delay results in a gradual attrition in the integrity of the total investment.

In sum, the Board is convinced that in fixing a rate structure for this Company, we must take into account the effect of inflation on its financial structure. This is our concern: how shall we adapt traditional rate-making techniques to meet the continuing rise in new construction and equipment costs?

\* \* \* \* \* \* \* \*

We decided in the present case to relate our method directly to the problem being attacked. We keyed the rate base of this Company to its increased investment. The Company plans to expend for plant additions in 1958 approximately $100,000,000, which is equivalent to approximately 20% of its existing net investment in utility plant. This estimate is based on firm engineering plans which we find to be accurate. Land has been purchased, build-

ings are being constructed, and central office equipment and cables are being installed. The 1958 construction program is committed and must be completed regardless of whether the net income increases, remains the same or declines. The rate base of necessity will increase.

Much of the increase in plant investment will not produce additional revenues. A great deal of it is allocable to increases in prices resulting from inflation. Part of the increases will be spent on conversion of exchanges from manual to dial; although these expenditures improve the service they do not, of themselves, produce any additional revenue. Based on the Board's experience with this Company and recognizing the consistent increase in investment per main telephone, the Board is satisfied that the amount of the average 1958 increase in net investment included in rate base is of such a nature that it will not generate such increased revenues that it would extend the rate of return beyond the upper limit of the range that the Board considers fair and reasonable.

We have decided to increase the December 31, 1957 depreciated original cost rate base by less than 5%, or $25,500,000, which is the average 1958 Increase in Net Investment. In arriving at this sum, we have considered many factors in addition to the average increased investment that is committed and under way for 1958. We took into account, of course, the attrition in the Company's investment resulting from inflationary increases in new construction and equipment costs. The Board also weighed the extent to which this attrition is compensated for by an expanding economy and other factors beyond management control. We have considered the technological improvements and the quality of the service furnished to the public.

The Board views a total rate base of $527,541,000 as the fair value of the Company's property used and useful in the public service at the time of its employment therein, viewing the property as an integral and unitary whole. The rate base fixed in our previous Decision and Order of December 30, 1957 will therefore not be modified."

Thus the Board discusses the problem of inflation in general and of attrition in particular. It is not clear whether the Board determined that the item of 25½ million dollars was intended as an over-all corrective factor to account for the general problems engendered by inflation, or the more specific problem of attrition.

As an aid to analysis, it will be useful to outline and define some of the more generally recognized problems of inflation in the utility regulation field.

Inflationary trends in post-World War II America, be they "creeping or galloping," have engendered problems for public utilities.

In the postwar years following the landmark case of *Federal Power Commission v. Hope Natural Gas Co.*, 320 *U. S.* 591, 64 *S. Ct.* 281, 88 *L. Ed.* 333, in 1944, which has generally been interpreted as giving regulatory agencies, state and federal, a constitutionally wide range of discretion in fixing utility rates, courts and regulatory agencies and commentators have addressed the problems of inflation.

At least four separate economic effects of inflation upon the rate of return of public utilities are discernible.

First, there is the question of the purchasing power of the dollar in a period of high prices. See generally, *Nichols, Ruling Principles of Utility Regulation—Rate of Return,* 153 *et seq.* (1955) ; *Note, "Original Cost Rate Regulation and Inflation,"* 66 *Harv. L. Rev.* 1274 (1953). The argument here is that if a utility's profit remains fairly constant in dollars, but the purchasing power of those dollars has been substantially decreased from pre-World War II levels, the profit has a decreased real value. To adjust for the effects of inflation upon the purchasing power of a dollar, utilities generally have argued that the fair value of their property used and useful in public service should be calculated upon the basis of the current costs of such property, less depreciation, as distinguished from original or historical cost. Various formulae for calculating current costs have been advanced, including reproduction cost of the property, reproduction cost of the service and trended costs which are simply original costs bases adjusted by one or another of the cost-price indices. Efforts to have utility commissions calculate the rate base by use of reproduction or trended costs have been largely unsuccessful because of serious drawbacks in such techniques. In the instant case, although the company introduced evidence concerning trended costs, the Board indicated its continued adherence to the net investment formula.

The second impact of inflation is upon depreciation allowances. Generally these allowances are based upon original rather than replacement costs. See *Note, supra,* 66 *Harv. L. Rev.,* at *pp.* 1282–1285. Thus, utilities have argued that when old plant wears out, they cannot in periods of inflation replace it at original cost and they are forced to obtain new investment to keep capacity intact.

Thirdly, interrelated but not coextensive with the factor of depreciation, is the factor of attrition or erosion of the rate of return. See generally, *Nichols, supra,* at 158 *et seq.; Note, supra,* 66 *Harv. L. Rev.* 1274.

As the Supreme Judicial Court of Massachusetts, quoting the language of the Massachusetts Commission in relation to attrition, stated:

" 'This terminology has been used to describe the tendency of the rate of return to diminish in a period of comparatively high construction costs, since new plant is being added which, as we have already found, is relatively expensive per telephone station. As the high cost plant comes into service, it tends to increase the applicable rate base at a more rapid pace than the resultant earnings, and the rate of return decreases accordingly.' " (*New England Telephone & Telegraph Co. v. Department of Pub. Util.,* 331 *Mass.* 604, 622, 121 *N. E.* 2d 896, 906 (1954).)

Attrition is the result of two factors—(1) the fact that construction costs are steadily increasing, and (2) the fact that the bases for calculating the rate of return are made in the year prior to that for which the return is calculated.

To illustrate: If in the test year the value of plant in service per main telephone is $100 and the fair rate of return is found to be 6%, then a rate calculated to return the Company $6 will be allowed. But if, as a result of increasing construction costs in the succeeding year when the new rates become effective, the value of plant in service per main telephone is $105, then a return of $6 will result in a rate of return of only 5.71%. This tendency of the rate of return to gradually diminish as plant facilities are added at current cost levels further results in relative in-

stability of rate determinations. As the realized rate of return falls below the allowable rate the utility tends to make more frequent applications for rate increases than would be the case if the attrition factor were compensated for.

As was recently observed in the dissenting opinion in *In re Board of Fire Commissioners, Fire Dist. No. 3, Piscataway Tp.*, 27 N. J. 192, at *page* 214 (1958), "rate hearings are time-consuming and tedious affairs, and repetitious applications for such rate increases are not practical as a solution to the problem."

Lastly, the impact of inflation results in the problem of "regulatory lag." See *Nichols, supra,* at *pp.* 167–169; *Note, supra,* 66 *Harv. L. Rev.* 1274. Regulatory lag is the loss of proper earnings claimed by the utility between the time that a petition for a rate increase is filed and the rate relief actually becomes effective by administrative or judicial determination.

It is likely that the Board, in the instant case, was attempting to compensate for the attrition factor, and not for the other effects of inflation outlined. After discussing the attrition problem, it is said: "This is our concern: how shall we adapt traditional rate-making techniques to meet the continuing rise in new construction and equipment costs? * * * We decided in the present case to relate our method directly to the problem being attacked. We keyed the rate base of this Company to its increased investment." The parties to this appeal are in agreement that the attrition factor was the problem aimed at by the Board.

However, as we previously noted, there is language in the decision on the remand which might be interpreted to mean that the Board intended the 25½ million dollar addition to the rate base to be an over-all compensating factor for all the ramifications of inflation upon the utility's operations.

For purposes of this appeal we shall assume both postulates.

Appellants argue that the inclusion of a future addition to property in determining the current rate base constitutes legal error. It is urged that the Board may not depart from the figure of the test year.

██ We find this view of the Board's powers to be too circumscribed. It is now a familiar criterion that, in establishing a rate base:

'the Board must determine the rate base at the fair value of the property of the public utility that is used and useful in the public service at the time of its employment therein, by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. *In re New Jersey Power & Light Co.*, *supra*, 9 *N. J.* 498, at *page* 509; *Public Service Coordinated Transport v. State*, *supra*, 5 *N. J.* 196, at *page* 217; *Atlantic City Sewerage Co. v. Board Pub. Utility Com'rs.*, *supra*, 128 *N. J. L.* 359, at *pages* 365, 366." (*New Jersey Bell Telephone Co. v. Department of Public Utilities, Board of Pub. Utility Com'rs.*, 12 *N. J.* 568, at *pages* 585–586 (1953).)

In so doing, it has been recognized that:

"* * * there are a number of formulae useful in determination of fair value of a utility's property for use as a rate base and that *the Board is not and should not be bound by any simple formula or combination of formulae. Public Service Coordinated Transport v. State*, *supra*, 5 *N. J.*, at *page* 217; *In re New Jersey Power & Light Co.*, *supra*, 9 *N. J.*, at *page* 510." (*New Jersey Bell Telephone Co. v. Department of Public Utilities, Board Pub. Utility Com'rs.*, 12 *N. J.* 568, at *page* 585 (1953).)

██ The Board is not girded in its determinations with an ironbound formula which must be automatically applied in each instance. Rather, as stated by Mr. Chief Justice Vanderbilt in *Public Service Coordinated Transport v. State,* 5 *N. J.* 196, 217 (1950): "The determination of fair value * * * should reflect the reasonable judgment of the Board based upon all the relevant facts."

██ So long as the determination of the rate base reflects the reasonable judgment of the Board and is grounded upon sufficient relevant and competent evidence, it is not the judicial province to interfere in what is essentially a legis-

lative function. See *Central R. Co. of New Jersey v. Department of Public Utilities*, 7 N. J. 247, 260 (1952); *New Jersey Bell Telephone Co. v. Communications Workers, etc.*, 5 N. J. 354, 375 (1950).

In view of the wide area of discretion vested in the Board in determining the fair value of a utility's property, it is evident that the Board is not obligated to, although it may, adhere to a net investment formula, which has been the dominant yardstick in New Jersey.

It is further argued that the Board was in error in relating 1957 (the test year) expenses and earnings data to a rate base calculated upon 1958 net investment. It is said that once the Board determined to depart from the 1957 net investment and to add thereto average net investment for 1958, it was obliged to concomitantly consider 1958 revenue and expense expectancies.

The Attorney General presents a contention on this appeal calculated to demonstrate that in ignoring additional revenue resulting from increased traffic and installations and planned technical improvements, a distorted picture results. It is alleged that on the basis of operating reports of five months during 1958, the company will receive during 1958 a minimum of $8,300,000 in operating revenues over that which the Board intended the company should receive in order to permit it to earn a fair return. Such excess, it is alleged, would increase the rate of return to approximately 7% on the rate base adopted by the Board.

It does seem that such increased revenue (if any) in the year following the test year should be considered if the Board determines to allow average increase in net investment in the year following the test year. But this is simply a dictate of logic and not of law. If, for example, the facts in evidence indicate that 1958 average increase in net investment without consideration of possible increased revenues resulting therefrom is rationally and reasonably related to the problem being attacked, then the judicial inquiry is at an end.

■ Thus, we cannot, as an abstract proposition, say that the Board's determination to calculate the fair value of the Company's property by reaching outside of the test year and including 1958 average increase in net investment is erroneous as a matter of law. Nor is it rendered necessarily erroneous by the failure to take into account projections of 1958 earnings and expenses, provided always, of course, that there is demonstrated a rational and reasonable relationship between the problem of determining fair value and the formula utilized to ascertain such value.

■ We recognize that rate making is by necessity a predictive science, for the rates of tomorrow are fixed on the facts of today. The Board is obliged, as an ultimate standard, to establish rates "sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties." *Public Service Coordinated Transport v. State, supra,* 5 *N. J.* at *page* 225.

If rates established in the test year are to measure up to that standard in the year in which they are to become effective, and further if, in order to achieve a degree of stability, they are to measure up to the standard for a reasonable time thereafter, it is, as stated by Mr. Justice Heher, "requisite that there be 'an honest and intelligent forecast' of probable future values." *Atlantic City Sewerage Co. v. Board of Public Utility Commissioners,* 128 *N. J. L.* 359, 366 (*Sup. Ct.* 1942) ; affirmed on opinion below, 129 *N. J. L.* 401 (*E. & A.* 1943).

■ It is thus apparent that the Board may adjust the 1957 year-end net investment of the Company by a figure calculated to account for the impact of inflation in general or attrition in particular. Indeed, such adjustments are commonplace. As we noted in *In re New Jersey Power & Light Co., supra,* 9 *N. J.* 498, 516:

"\* \* \* courts and utility commissions throughout the country generally appear to recognize the doctrine that in determining rate valuations there should be taken into consideration the fact that a higher level of prices and materials has been brought about by conditions due to the devaluation of the dollar, the recent World War and the current emergency and inflationary economic situation, \* \* \*."

If the average increase in net investment for the year following the test year appears from the evidence to be rationally and reasonably related to the problem of inflation or attrition, there exists no legal obstacle to its utilization.

In the instant case, however, our study of the record fails to reveal any evidence tending to correlate the figure of 25½ million dollars to the impact of inflation or attrition upon the company. The only reference to 1958 net investment figures in the record is the testimony of Mr. Boyette, the comptroller of the company, who testified:

"The current 1958 construction program of $100,000,000 would mean net additions to plant, after deducting retirements, of about $75,000,000. Of this amount, about $12,000,000 will be financed from increases in the depreciation reserve, leaving about $63,000,000 to be added to the Company's net investment in plant. The intrastate portion of this, at the 31% ratio shown on Exhibit P–10A, page 2, would be $51,000,000. Thus, the intrastate property investment of $502,041,000 at December 31, 1957 as shown on Exhibit P–10A, page 7, would be increased by $51,000,000 during 1958. This would mean an average increase of one-half that amount, making an average intrastate property investment for the year 1958 of $527,541,000."

The figure for 1958 average increase in net investment hangs suspended in the evidence. This is not to say that the Board did not have competent evidence before it bearing upon the problems of inflation and attrition, but rather that no evidence may be found tending to show how or why the average 1958 increase in net investment is an appropriate corrective factor to be added to the 1957 year-end rate base in order to account for those problems. Thus, the basic point here is that there is a factual vacuum in the gap between the basic determination that 25½ million

dollars represents the average 1958 increase in net investment and the ultimate finding that that figure be added to 1957 year-end net investment in order to arrive at a figure representing the fair value of the Company's property used and useful in the public service at the time of its employment therein.

Boyette did testify concerning the problems of attrition and to the corrective factors which might be applied to a net investment theory in order to compensate for that feature as follows:

"The book cost of telephone plant per total telephone during 1956 was $299. During 1957, net additions to plant for each telephone gained will be about $500. If the 149,000 telephones we expect to gain in 1957 could be added for $299 each, the average intrastate investment would be reduced by about $24,700,000. Earnings at 6½% on this amount is equivalent to .33% rate of return on average intrastate investment."

However, the Board did not adopt the figure of $24,700,000 propounded by Boyette, but rather chose the 25½ million dollar figure representing the 1958 average increase in net investment. The distinction is not simply one in terms of dollars, but rather a distinction in basic underlying principle in calculating the proper adjustment for the proper problem.

It might be noted that the Board indicated that the 25½ million dollar figure increased the 1957 year-end depreciated original cost rate base by less than 5%. It might well be that a determination by the Board that an over-all correction of 5% to the 1957 year-end net investment will account for the general problems of inflation, or the narrower problem of attrition would be upheld as an exercise of reasonable expert judgment based upon all of the relevant facts. But the Board did not indicate that it determined to add 5% of net investment as an overall corrective factor; rather it determined to add the specific figure representing the 1958 average increase in investment which it parenthetically noted was less than 5%.

We cannot supply the evidence and findings necessary to relate that figure to the effects of inflation or attrition on the company's earnings.

If the Board did intend to adjust for attrition alone, then it would seem that only so much of average 1958 net investment should be added as represents the excess in 1958 investment over and above what 1958 investment would have been if the average investment per telephone could have been maintained at the 1957 year-end level. If the Board intended to compensate for the overall impacts of inflation, then there is nothing in the record tending to correlate the 25½ million dollar item to that problem.

As was stated by this court in *Central R. Co. of New Jersey v. Department of Public Utilities, supra, 7 N. J.* at *pages* 260–261:

"It is now firmly settled in our system of jurisprudence that there must be sufficient or substantial competent and relevant evidence to support the findings of fact and reasonableness of the rates established by the Board. * * *

Furthermore, the prevailing rule is that findings of facts below are essential in rate cases and may not be supplied by implication."

And, as was observed in *New Jersey Bell Telephone Co. v. Communications Workers, etc., 5 N. J.* 354, 376, 377 (1950), in commenting on the problem of administrative findings of fact:

"Clearly it is the function of the administrative authority and not the courts to find the facts. Findings must be free from ambiguity which raises a doubt as to whether the administrative authority proceeded upon a correct legal theory. The most reasonable and practical standard is to require that findings of fact be sufficiently specific under the circumstances of the particular case to enable the reviewing court to intelligently review an administrative decision and ascertain if the facts upon which the order is based afford a reasonable basis for such order."

In view of the vagueness or ambiguity as to what factor or factors the Board sought to adjust by its addition

of \$25,500,000 to the rate base, we are unable to determine whether that sum was properly included.

In order to more fully dispose of the issues presented on this appeal we should further note that if the Board on remand hereinafter referred to determines that the 25½ million dollar figure cannot be related to the problem it desires to solve (the problem should be specified) or, if it determines that it no longer desires to adhere to that figure, there are a number of methods currently prevalent for handling the problem of attrition.

First, the method most generally followed is to increase the otherwise allowable rate of return. See, *e. g., Re Southern Bell Teleph. & Tel. Co.,* 92 *P. U. R. (N. S.)* 335 *(Fla.* 1952); *Re Northwestern Bell Telephone Co.,* 100 *P. U. R. (N. S.)* 221 *(S. D.* 1953); *Re Northwestern Bell Telephone Co.,* 19 *P. U. R. 3d* 233 *(Neb.* 1957); *Re New York Telephone Company,* 20 *P. U. R. 3d* 129 *(N. Y.* 1957); *Re General Teleph. Co. of Calif.,* 25 *P. U. R. 3d* 1929 (1958). In this connection it should be observed that raising the otherwise allowable rate of return by a factor intended to temporarily allow for attrition, or raising the otherwise allowable rate base, are equivalents and the Board may do either. See *Re Northwestern Bell Teleph. Co.,* 2 *P. U. R. 3d* 33 *(Minn.* 1954). This is distinguishable from the present action of Board in raising the rate base by a figure representing average 1958 increase net investment, since the latter figure, at least on the present record, is arbitrary in the sense that it bears no rational relationship to the problem being attacked.

Secondly, some commissions have simply utilized the year-end rate base calculations as was additionally done by the Board in the instant case. See *e. g., Re Public Service Co. of N. H.,* 98 *P. U. R. (N. S.) (N. H.* 1953); *Re Southwestern Bell Teleph. Co.,* 2 *P. U. R. 3d* 1 *(Ark.* 1953); *Re Florida Teleph. Corp.,* 17 *P. U. R. 3d* 126 *(Fla.* 1956); *Re Mountain States Teleph. & Teleg. Co.,* 27 *P. U. R. 3d* 259 (1959). See also *Board of Supervisors of Arlington*

*County v. Virginia Elec. & Power Co.*, 196 *Va.* 1102, 87 *S. E. 2d* 139 (*Sup. Ct. App.* 1955). This technique adjusts for such attrition as results in the test year, although not beyond.

Thirdly, other commissions have compensated for the attrition problem by combining an end-of-period rate base with an increase in what otherwise was found to be a reasonable rate of return. See *e. g., Re Mountain States Tel. & Tel. Co.*, 1 *P. U. R. 3d* 129 (1953); *Re Chesapeake & Potomac Tel. Co. of Va.*, 21 *P. U. R. 3d* 239 (*Va.* 1957), affirmed *sub nom. City of Lynchburg v. Chesapeake and Potomac Tel. Co. of Virginia*, 107 *S. E. 2d* 462 (*Va. Sup. Ct. App.* 1959).

Fourthly, some commissions have adjusted an original cost rate base by a figure representing the excess of new investment in a period beyond the test year over what such investment would have been if it were constructed at the same average cost as existing plant. This formula, too, has been coupled with an end-of-period rate base. See *e. g., Re Mountain States Tel. & Tel. Co.*, 2 *P. U. R.* 375 (*Utah* 1953); *Re Southern Bell Tel. Co.*, 18 *P. U. R. 3d* 113 (*Ky.* 1957); *Re United Fuel Gas Co.*, 27 *P. U. R. 3d* 365 (*W. Va.* 1959).

It should be emphasized that in setting forth the various formulae employed by regulatory agencies throughout the country we do not intend thereby to indicate that the Board must utilize one or another of them. The Board is free to accept or reject them as it sees fit, or to adopt any other formula. It is only requisite that the formula adopted be, from the reasoning of the Board based upon the evidence presented, *i. e.,* its expertise in these matters, rationally related to the problem attacked.

The matter is accordingly remanded to the Board for further findings and order in harmony with this opinion, to be made by it upon the present record and such further testimony as may be offered in the light of this opinion upon the petition of any party or by the direction of the Board

itself. If any party should be dissatisfied with the result reached by the Board upon this remand, the matter may be brought before us for further consideration by motion filed in this cause within 20 days after the Board's action. In that event the matter will be set down for further argument upon the briefs and appendices now before us and such supplemental record and briefs as may be needed. To that end, we retain jurisdiction.

*For remandment*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*Opposed*—None.