57 N.J. Super. 158 (1959)
154 A.2d 201
IN THE MATTER OF THE REVISION IN RATES FILED BY PLAINFIELD-UNION WATER COMPANY INCREASING ITS RATES FOR WATER SERVICE.
PLAINFIELD-UNION WATER COMPANY, APPELLANT AND CROSS-RESPONDENT,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENT, AND STATE OF NEW JERSEY, RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 25, 1959.
Decided September 1, 1959.
*163 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. John R. Sailer argued the cause for appellant and cross-respondent.
Mr. H. Frank Pettit argued the cause for cross-appellant.
Mr. Howard T. Rosen argued the cause for respondents and cross-appellant (Mr. David D. Furman, Attorney General, attorney).
*164 The opinion of the court was delivered by HANEMAN, J.A.D.
This is an appeal by Plainfield-Union Water Company (the company) from a final decision and order of the New Jersey Board of Public Utility Commissioners (the Board) on the company's application for increased rates. The company complains that the rate increase allowed is less than what it maintains is necessary to permit it to carry out necessary construction. Rate counsel, appointed by the Attorney General, prosecutes a cross-appeal from the Board's inclusion of certain scheduled construction projects in the rate base.
On January 31, 1958 the company filed a schedule of rates with the Board. That schedule reflected an increase in rates equal to approximately 18% of the rates the company was then charging its users. On February 13, 1958 the Board ordered the proposed schedule of rates suspended and fixed April 14, 1958 as the first date of hearing on the justness and reasonableness of the proposed rates. The company was ordered to give notice to its customers of the purpose, time and place of the hearing. Public hearings were held on five days between April 14 and May 29, 1958. Represented at these hearings were the company, the public (through rate counsel appointed by the Attorney General), and the Inter-municipal Water Committee (a group composed of representatives of the municipalities served by the company).
By an order dated August 28, 1958 the Board determined that the existing rates were unjust and unreasonable because the company was denied thereunder an opportunity to earn a fair return; but that the yield under the rates proposed by the company would be excessive. The Board permitted an increase in the company's annual revenues equal to $201,245, rather than, as requested, $428,891. The increase allowed would permit the company to earn operating income of $574,362, a return equal to 6% per annum on a rate base of $9,572,704.
*165 The company appeals from that order. Its appeal challenges the reasonableness of the Board's action on the following grounds: the increase allowed will not permit the company to maintain and support its credit and to raise the capital necessary to a proper discharge of its duties; the refusal by the Board to give weight to the depreciated reproduction cost rate base; its reduction of the company's rate base by the amount of profit realized on the 1931 sale of a portion of the company's distribution system; its refusal to value the company's real estate at fair market value; its refusal to "normalize" 1957 metered water consumption and adjust operating revenues accordingly for purposes of calculation of income for the 1957 "test year"; its refusal to "normalize" federal income taxes and adjust operating expenses accordingly; its rejection of amortized expenses of prior rate cases as an operating expense in the test year for the same purpose; and, finally, the order is violative of the United States and New Jersey Constitutions as a taking of private property without compensation and without due process of law.
On the cross-appeal rate counsel challenges the reasonableness of the company's rate base as determined by the Board upon the ground that the Board included $887,600 therein for projected additions to the company's plant, representing improvements and extensions (mainly non-revenue producing) which were only proposed, i.e., facilities not then existing and used or useful in the public service.
The company provides water service to approximately 52,000 customers located in 21 municipalities in Union, Somerset and Middlesex Counties. (This represents an increase in the number of customers of approximately 2,000 over the number served in 1956). The water supply is obtained from wells and by purchase from adjacent water companies, principally Elizabethtown Water Company, Consolidated. Storage is provided by the use of collecting basins and closed reservoirs, tanks and standpipes. The distribution system is composed of approximately 500 miles of cast iron *166 mains ranging in size from 2 to 24 inches. Attached to the system are about 300 fire hydrants.
During World War II there had been little increase over the prior demand for water in the territory served by the company. Consulting engineers for the company estimated at that time that the average daily demand for 1956 would range between 12 and 13 million gallons. This figure was exceeded in 1949 and 1951. Service difficulties developed during drought periods from 1949 to 1955, with resulting complaints by consumers to the Board and various municipal officials.
Eighteen of the municipalities serviced by the company formed the Inter-municipal Water Committee for the purpose of investigating the necessity for improvements to assure adequate water service. After the receipt of independent engineering advice, this committee concluded that construction of additional physical facilities was required to accomplish that end, and that an increase in rates was necessary to finance such construction. The company concurred in this finding and in 1956 adopted a capital improvement program to accomplish the improvements recommended.
The company requested an increase in rates during 1953. The rates then proposed were designed to produce additional annual revenue of $582,500, thus enabling the company to obtain $1,000,000 additional capital for construction purposes. By an order dated March 24, 1954 the Board granted a rate increase to produce additional revenue of $272,280. Actual expenditures for capital improvements in 1954 amounted to $900,223.
In 1956 the company adopted a five-year construction program which provided for expenditures of $1,710,000 between the years 1956 and 1960. In that year the company again requested the Board to approve an increase in rates designed to produce $550,000 additional annual revenue in order to obtain additional funds necessary to finance the five-year improvement program. The Board granted a rate increase *167 designed to produce additional annual revenue of $249,600. The company expended in excess of $250,000 for major capital improvements during 1956 but deferred any further construction during 1957, assertedly because of its inability to raise further capital.
Thereafter the company adopted a new three-year program of major construction improvements necessitating a total expenditure of $1,795,000. As projected, $202,600 would have been expended immediately (in 1958), $685,000 by the summer of 1959, $476,000 by the summer of 1960, and $431,400 by the summer of 1961. Of these amounts, only the first two items, aggregating $887,600, were included by the Board in the company's rate base for purposes of the present rate application.
No one suggests that the company presently has adequate facilities to provide its customers with reasonably adequate water supply, nor that the construction program recommended to the company by its engineers and those of the Inter-municipal Water Committee, and approved and adopted by the company, is improper or unnecessary to enable the company to furnish an adequate and safe water supply to its customers.

I.
The company argues that it is entitled to a rate of return on the rate base which will permit it to perform the duties imposed upon it, and as the rate allowed will not permit it to discharge its duties, it does not provide an opportunity to earn a fair rate of return.
Our chief duty in a rate case is to pass upon the soundness of the rate base and the reasonableness of the rate of return thereon established by the Board. The discharge of this duty necessitates a review of the record to ascertain whether there is competent and relevant evidence to support the findings of fact and the reasonableness of the rates established by the Board. Public Service Coordinated Transport v. State, 5 N.J. 196, 215 (1950); Central *168 R. Co. of New Jersey v. Dept. of Public Utilities, 7 N.J. 247, 260 (1951). The justness and reasonableness of the rates established can only be determined after an examination of the company's property valuation which constitutes its rate base, its revenues and expenses, including income taxes and an allowance for depreciation, and the rate of return developed by relating its net income to the rate base. Public Service Coordinated Transport v. State, supra, 5 N.J. at page 216.
However, the scope of our judicial function in rate cases does not extend to the field of original fact-finding. Our duty is to review the record to ascertain whether the facts as found by the Board are bottomed upon relevant and competent evidence and form a rational and reasonable basis for the conclusions of the Board. State v. N.J. Bell Tel. Co., 30 N.J. 16, 29, 30 (1959). The requirement that the Board must make findings of sufficient definiteness to support a reasoned conclusion at which they arrive is a substantive matter. Findings are essential to a rate case and may not be supplied by implication. Central R. Co. of New Jersey v. Dept. of Public Utilities, supra, 7 N.J. at pages 261-262; New Jersey Bell Telephone Co. v. Communications Workers, etc., 5 N.J. 354, 375-377 (1950), and such findings must flow from the facts (as found by the agency) by a reasoned process.
Thus, initially we look to the decision and order to determine whether a reasoned conclusion is expressed, i.e., a conclusion grounded in findings of appropriate definiteness which are supported by relevant and competent evidence.
Although, as indicated above, the company has taken exception to various determinations of the Board affecting its conclusions as to rate base and operating income (discussed later in this opinion), the major contention of the company on this appeal is that the dollar amount of additional revenue, resulting from the Board's designation of a 6% rate of return as "adequate," "fair" and "reasonable," and the application thereof to the adjudicated rate base, does not suffice *169 to support certain financing designed to yield capital funds requisite to carry out the improvement and extension program aforementioned. This program, as indicated, is represented by the company to be necessary to enable it to render adequate water service on a long-range basis and under any adverse conditions of drought and consumer demand reasonably to be contemplated.
Expert testimony was adduced by the company designed to show the following: The only feasible method of obtaining the $1,795,000 of new construction capital needed was to pay off its existing short-term debt of $3,830,000 by raising approximately $2,750,000 on first mortgage bonds and floating $1,350,000 of new common stock, thereby providing the additional capital construction funds now needed and improving the debt ratio of the corporate capitalization. At the present time this ratio is 63.11%, an undesirable situation of terms in the company's present and future credit position. As recapitalized under the plan mentioned, the debt ratio would be reduced to the more favorable position of 50%. The successful marketing of the new securities, however, having regard to the current condition of the securities market and the competition of other securities of comparable character and risk, would require, according to these proofs, not only the improvement of the debt ratio position but also the prospect of dividends on the common stock at a rate realizable only by securing an increase of revenues in the amount sought in the rate application.
No testimony or cross-examination substantially refuting the foregoing thesis was submitted by rate counsel or any other interested party.
It appears to us that a discussion of the legal problems presented by the company's position in the foregoing respects must be integrated with a consideration of the question raised by rate counsel for the public, mentioned above, regarding the propriety of inclusion in the rate base applicable to the test year 1957 of investment in utility plant not to be made until 1958 and 1959 (as allowed by the Board) or until *170 1960 and 1961 (as requested by the company). There would seem to be some degree of relevancy between the propriety of inclusion of future construction in a current rate base and the reflection in a rate of return of a factor for income needed to raise the capital to be used in such construction.
Since the decision of the Board in the instant case the Supreme Court has decided State v. N.J. Bell Tel. Co., supra, 30 N.J. 16 (decided June 1, 1959). It was there held that it is not necessarily erroneous, in principle, to include in the rate base for a particular test year the average increase in net investment for the following year without also taking into account projections of earnings and expenses for the following year (at page 31). It is sufficient if there is a rational and reasonable relationship between the thus expanded rate base and the objective of a fair and reasonable return to the utility. The apparent basis for the inclusion of prospective extensions of plant in rate base in that case consisted of the factors of inflation and attrition of return (as explained at page 27). But the court found itself unable to approve the specific amount of prospective construction added to rate base by the Board because the findings of the Board failed to correlate that figure to any particular justifying factor in terms rationally explanatory of the conclusion (pages 32-33), and the case was remanded for further findings.
In the instant case the Board's findings and conclusions respecting inclusion of prospective construction in rate base are as follows:
"For the purpose of this proceeding, Mr. Buck [Company's engineer] testified that he recommends that the Company proceed with the major improvements which are not productive of any significant amount of additional revenues. The program is set forth in detail in Exhibit P-11 and is summarized as follows:

 Immediate Construction ...................... $202,600
 For completion by summer of 1959 ............ 685,000
 For completion by summer of 1960 ............ 476,000
 For completion by summer of 1961 ............ 431,400
 __________
 $1,795,000
 __________

*171 After review of the entire record, and having in mind the service deficiencies which a program of this nature is intended to correct for the benefit of its customers, and considering the time elapsed since the development of the Company's 1957 rate base and the effective date of any increased rates provided for herein, the Board is of the opinion that here, as we have held in other cases, it is in the public interest to extend the rate base period beyond the average for the year 1957. We will include in our calculation of rate base the net investment in company property for that portion of the construction program designated for `immediate construction' and $685,000 for that portion of construction designated `for completion by the summer of 1959.' The result of the foregoing is $9,572,704, which we find is a fair and reasonable rate base for the purpose of this case."
It will be noted that the construction program in the present case was merely an engineering recommendation, not, as in the Telephone Company case, supra, an actual commitment of the utility. The company conceded at the argument before us that notwithstanding the fact that the increased rates allowed by the Board were then in effect (May 1959), it had expended only $75,000 for new construction as against the $887,600 for such construction, represented by the company as programmed for completion by the summer of 1959, which was allowed for inclusion in rate base by the Board.
The allowance for future construction by the Board in this case appears to have been founded on the concept that since the new extensions and additions to plant would come into existence at or reasonably soon after the time when the revised rates were to go into effect it was reasonable to anticipate them in the rate base. Moreover, since frequent and repetitive rate application proceedings are burdensome and expensive, and to be avoided if unnecessary, the anticipation in rate base of reasonably certain net additions to utility plant in the immediate future, particularly where a type not calculated to produce added revenue, would appear within the area of permissible agency discretion. As stated in the recent Telephone Company case, supra, 30 N.J. at page 31:
*172 "If rates established in the test year are to measure up to that standard in the year in which they are to become effective, and further if, in order to achieve a degree of stability, they are to measure up to the standard for a reasonable time thereafter, it is, as stated by Mr. Justice Heher, `requisite that there be "an honest and intelligent forecast" of probable future values.' Atlantic City Sewerage Co. v. Board of Public Utility Commissioners, 128 N.J.L. 359, 366 (Sup. Ct. 1942); affirmed on opinion below, 129 N.J.L. 401 (E. & A. 1943)."
The principle thus enunciated, however, has validity and relevance to the instant case, entirely apart from considerations of inflation or attrition of return, which were not stressed in the argument before us in this case, although that principle is accentuated in significance by such factors in the existing economic climate.
While the stated findings and conclusions of the Board adequately, although not too explicitly, support the conclusion for including in rate base the value of prospective construction, insofar as concerns the amount allowed, they do not undertake to explain the disallowance of the amounts programmed for completion in 1960 and 1961. While we might draw inferences in that respect, judicial speculation is not a good substitute for appropriate agency findings and conclusions. Since the case must be remanded for other reasons to be mentioned, the Board will be directed to specify the basis for its limitation of the amounts planned for new construction in fixing the rate base. The Board ought, moreover, to consider suitable sanctions for the failure of the company actually to expend for construction the full amounts allowed by the Board for inclusion in rate base.
This brings us to the company's complaint that it should have been granted a rate of return adequate to supply the full amount of net income needed, according to its witnesses, to raise the entire fund required for the projected 1958-1961 capital construction program of $1,795,000.
There is an abundance of authority to support the view that the rate of return of a public utility must be fixed not only with regard to current expenses of physical *173 operation but with consideration of the continual necessity, in the case of most utilities, to expand, extend, improve and modernize their facilities so as to render adequate, efficient, and economical service to the public, and, therefore, of the need to support and maintain its credit, essential to the furtherance of such programs. Nichols, Ruling Principles of Utility Regulation-Rate of Return (1955), pp. 47, 61, 62, 72, 76, 77, and numerous court and agency decisions exemplifying these principles cited therein. The necessity of maintaining and supporting the credit of the utility so that it may be enabled to raise money necessary for the discharge of its obligations is reiterated in the New Jersey decisions. New Jersey Bell Telephone Co. v. Department of Public Utility Com'rs, 12 N.J. 568 (1953); Public Service Coordinated Transport v. State, supra, 5 N.J. at page 225; State v. N.J. Bell Tel. Co., supra, 30 N.J. at page 31. The United States Supreme Court has held that the revenue should be sufficient to defray the capital costs of the business, including service on the debt and dividends on the stock; that the return to the equity owner should be commensurate with the return realizable on investments in other enterprises having corresponding risk. Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944).
As against the proofs summarized above and the legal principles referred to, the "Decision and Order" of the Board refers to the financial expert who testified for the company "as a seller of securities * * * interested in substantial earnings [whose] testimony would reflect that position" and then goes on to say:
"We will take into consideration the Company's operations, management, our Decision in Docket No. 9523, as well as the Company's plan for refinancing and all of the other factors in this proceeding, and as a result we conclude that 6% is an adequate and reasonable fair rate of return. In order that there may be no misunderstanding, we express our opinion that this rate of return should be sufficient to afford the Company an opportunity to accomplish the financing of the construction program herein discussed."
*174 We are unable to find in this part of the decision of the Board a reasoned conclusion in terms of the evidence in the case or the knowledge or expertise of the Board to explain the basis for the apparent rejection of the proofs of the company indicating that it could not raise the funds for its capital improvement program without new capital financing requiring the full amount of the additional revenues sought in its petition. The grounds upon which an administrative agency acts must be "clearly disclosed and adequately sustained," In re Plainfield-Union Water Co., 11 N.J. 382, 396 (1953). Moreover, there is an ambiguity in the reference in the decision to "the financing of the construction program herein discussed." We do not know whether this means the entire program through 1961 or the lesser program through the summer of 1959, for which allowance was made in the rate base. If the former, there is no explanation of the conclusion of the Board in the face of the evidence to the contrary. If the latter, does the Board mean that it regards the full program as unnecessary, or unnecessary at this time? If so, what facts and reasoning sustain such a conclusion? While it is stated that the opinion of the financial expert witness reflects his position as a seller of securities, no justification is shown for total disregard of the opinion, if that result is properly to be inferred. If the Board has any information or knowledge relevant to its conclusion, this should be stated on the record with an opportunity for response by the company. See Susquehanna Transit Commuters Ass'n v. Bd. of Pub. Util. Comm'rs., 55 N.J. Super. 377, 409, 410, 440 (App. Div. 1959).
We do not imply, of course, that the conclusion of the Board is necessarily incorrect. It is the presumably expert view of the Board, not that of the court, which must supply the elements of policy, discretion and judgment properly applicable in specialized administrative proceedings like these. We hold only, as did the court in the recent Telephone Company case, supra, that there is such an absence of *175 specific findings and reasoned conclusions relative to the matter of financing necessary extensions and improvements as to make it impossible for us to say, in our judicial function of review, whether the conclusion is, or is not, arbitrary and without support in fact or law. See State Corp. Commission of Kan. v. Federal Power Com'n, 206 F.2d 690 (8 Cir. 1953).
This aspect of the case will require remand for the formulation of precise findings and conclusions by which we may be able to understand how the Board reasons that the rate of return allowed comports with the financing requirements of the company. Additional testimony may be submitted by any party or by the Board and the Board may state for the record any facts or knowledge it may have relative to its conclusions, giving the parties an opportunity to meet the same by evidence and argument.

II.
The company asserts that (a) the Board erred in refusing to give weight to the depreciated reproduction cost rate base, and (b) that its real estate was not valued at fair market value. These matters have been recently reviewed in State v. N.J. Bell Tel. Co., supra, 30 N.J. 16, where the principles expressed in New Jersey Bell Telephone Co. v. Department of Pub. Utility Com'rs., supra, 12 N.J. 568; Central R. Co. of N.J. v. Dept. of Public Utilities, supra, 7 N.J. 247; New Jersey Bell Telephone Co. v. Communication Workers, etc., supra, 5 N.J. 354; and Public Service Coordinated Transport v. State, supra, 5 N.J. 196, were reiterated.
(a) The rule is that "the Board must determine the rate base at the fair value of the property of the public utility that is used and useful in the public service at the time of its employment therein." The Board reaches this determination "by reviewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying *176 the public need." New Jersey Bell Telephone Co. v. Department of Pub. Utility Com'rs., supra, 12 N.J. at page 585.
The Board is not bound to any particular formula or combination of formulae in determining the fair value of the company's property. State v. N.J. Bell Tel. Co., supra, 30 N.J. at page 29. That determination must, however, be bottomed upon substantial, competent, relevant evidence. Reproduction cost is one guide to fair value, but not a measure. New Jersey Bell Telephone Co. v. Department of Pub. Utility Com'rs, supra, 12 N.J. at page 586. There is little to recommend the use of depreciated cost reproduction figures for items that no one would want to reproduce as a basis for the Company's rate base. However, the Board may, but it is not bound to, "adhere to a net investment formula, which has been the dominant yardstick in New Jersey. State v. N.J. Bell Tel. Co., supra, 30 N.J. at page 30. The Board's determination on the fair value of the company's assets and its decision on the non-applicability of the depreciated reproduction cost rate base, if properly founded in the evidence, is beyond judicial inference.
(b) The company's evidence as to real estate values was based upon the best and highest use possible for the land at its situs. No allowance was made in the appraisals for the cost of restoring the land to a condition where it could be so used. The Board rejected this testimony in favor of a valuation based upon the actual use of the land rather than on the highest or best use to which the land could be put. We cannot say, in view of the factors involved in such a valuation, that the Board erred in rejecting this testimony and adopting a net investment approach to the problem.

III.
The company asserts that the Board erred in deducting the profit from the 1931 sale of a portion of its distribution system (the Elmora property) from earned *177 surplus and crediting that amount to the depreciation reserve account. The Board had made this same adjustment in the company's 1954 and 1957 rate cases; the company was apparently satisfied with the correctness of this procedure. The adjustment was made to conform the company accounts to the Board's uniform system of accounts for water utilities. There has been no change in the uniform system since 1957.
The rules applicable to the construction of statutes are, in general, applicable to the construction of rules or regulations promulgated by an administrative agency. In re Port Murray Dairy Co., 6 N.J. Super. 285, 300 (App. Div. 1950); 73 C.J.S. Public Administrative Bodies and Procedure § 105, p. 425. It is the intention with which the rule or regulation was adopted that is controlling. A long period of consistent construction by an administrative agency of its rules and regulations is entitled to great weight in ascertaining the meaning or intent of a given rule or regulation. Cf. In re Borough of Glen Rock, 25 N.J. 241, 246 (1957). Courts are not wont to overturn the construction given to its own rules and regulations by an administrative body. 73 C.J.S. supra, § 106, p. 426. We find no error in this adjustment.

IV.
The refusal to normalize 1957 metered water consumption: The testimony offered by the company demonstrated that the water use during 1957 was inflated because of dry weather conditions. It sought to have the water consumption figure "normalized," that is, adjusted downward to a figure which would more nearly represent the amount of water consumed in the more usual or "normal" year. Although not denying that 1957 was an abnormal year, the Board rejected this request by saying:
"We have considered the Company's claim for normalization due to weather conditions and because of the speculative adjustment *178 which the Company makes, we find that we cannot rely on the result and hence we will not give consideration to this adjustment in our calculation of operating income."
While the Board, in its opinion, capsulated the testimony of the company's expert which reflected the results of a water use study he made, aimed at showing that it would be reasonable for the Board to normalize 1957 water use, it failed to make specific findings of fact and relevant conclusions which would enable a reviewing court to test the reasonableness of its determination. For the reasons expressed under I above, we remand for appropriate findings.

V.
The reasoning set forth under III is applicable as well to the point made on the Board's refusal to include as an operating expense the amortized expenses of prior rate cases. The Board was "of the opinion that only the cost of the current rate case should be considered since the purpose of normalization is to reflect the amortization of current rate case expenses." In re Lakewood Water Co., PUC Doc. No. 10493 (1958). The Board has consistently followed this rule and we are not able to say that the rule or its application is unreasonable.

VI.
The company has adopted the declining-balance method of calculating depreciation of certain of its assets in accord with I.R.C. 1954, § 167, 26 U.S.C.A. § 167. This method permits the company to depreciate two-thirds of the cost of the asset during the first half of the useful life period of the asset.
The use of the declining-balance method permits the utility to charge, for income tax purposes, a larger sum against operating income during the early years of the useful life period of the property than during the remaining period. The company requested that $18,389 (the difference between *179 taxes actually paid in the test year and that which would have been paid if the straight-line method of calculating depreciation had been adopted) be allowed as an operating expense to offset the heavier tax burden which will fall on it during the later portion of the useful life of these assets. The refusal by the Board to do so accords with the practice adopted by it in other cases where depreciation is calculated by the declining-balance method under I.R.C. 1954, § 167. We cannot say that the action is unreasonable for rate case purposes.

VII.
The Board reduced the company's working capital from $428,339 to $325,000. $228,895 of this working capital consisted of cash, estimated on a computation of "lag-days" between revenue (the receipt of amounts due the company) and expenses (payment of its bills). The Board said only that it found errors in the calculation of the "lag-days." It did not specify what the errors were; it gave no reasons for picking the figure of $325,000 as the company's working capital. Here, again, what is called for is an exposition of factual findings and reasoned conclusions which led to the Board's decision on this phase of the case.
Remand for findings and conclusions conforming with this opinion. The court retains jurisdiction in the interim. The appeal may be noticed for further argument on supplemental briefs after the Board makes its supplemental findings and conclusions. No costs.