57 N.J. Super. 180 (1959)
154 A.2d 212
IN THE MATTER OF THE SCHEDULE FILED BY HACKENSACK WATER COMPANY, INCREASING AND CHANGING RATES FOR WATER SERVICE.
HACKENSACK WATER CO., APPELLANT,
v.
BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 1959.
Decided September 1, 1959.
*182 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Russell E. Watson argued the cause for appellant, (Mr. Samuel W. Zerman, attorney).
*183 Mr. Howard T. Rosen, Deputy Attorney General, argued the cause for respondent, Department of Public Utilities (Mr. David D. Furman, Attorney General, attorney for and of counsel with respondent; Mr. Joseph P. Lordi and Mr. Felix G. Forlenza, on the brief).
Mr. Christian Bollerman argued the cause for Mr. Alfred W. Kiefer, Rate Counsel by appointment of the Attorney General, attorney for and of counsel with appellant (Mr. Christian Bollerman, on the brief).
The opinion of the court was delivered by HANEMAN, J.A.D.
This is an appeal by Hackensack Water Company (Hackensack) and by rate counsel appointed by the Attorney General in the public interest from a decision and order of the Board of Public Utility Commissioners of the State of New Jersey (the Board), dated August 27, 1958. The two appeals were consolidated by an order of this court, filed November 20, 1958.
On June 28, 1956 Hackensack filed a schedule of increased rates with the Board, to become effective July 30, 1956. The proposed increase was calculated to produce an additional $2,500,000 in gross annual revenues. On January 18, 1957 the Board advised Hackensack that it would negotiate and agree to a schedule of rates designed to increase revenues by $1,000,000 rather than by $2,500,000, provided that, among other conditions, the negotiated rates would remain in effect for at least one year. On January 25, 1957 Hackensack accepted, and the temporary increase in rates was granted. On December 27, 1957 Hackensack petitioned the Board to reopen hearings for the purpose of permitting the schedule of rates filed on June 28, 1956 to go into effect on February 1, 1958. Hearings were thereafter held in February and March of 1958.
By its decision and order the Board found and determined that $46,827,987 was a fair and reasonable rate base and that a 6% return thereon was fair and reasonable. The *184 Board as well determined that the existing rates were unjust and unreasonable in that they did not afford Hackensack an opportunity to earn a fair return, but that the rates proposed by Hackensack would yield an excessive return. Hackensack was directed to file a new schedule designed to produce an increase in annual revenue of $1,000,050. In computing operating revenue deductions, the Board disallowed certain payments made to Spring Valley Water Works and Supply Company (Spring Valley) in connection with the operation of DeForest reservoir, and income tax adjustments resulting therefrom. (Both of these subjects are hereafter treated in greater detail.)
Hackensack's appeal is based on the following issues: (1) the Board's refusal to allow as an operating expense the full amount of Hackensack's 1957 payment under a contract with a wholly owned subsidiary company, Spring Valley, for benefits derived from DeForest Lake Reservoir (De Forest), a large impounding and river-regulating reservoir in Rockland County, New York; (2) the Board computed the federal income taxes of Hackensack as if the full annual payment to Spring Valley had been included in operating expenses, notwithstanding the disallowance of part of said payment.
Rate counsel's appeal is based on the following issues: (1) the amount of the rate base allowed by the Board; (2) the amount of the allowance by the Board of the annual operating costs of DeForest; (3) the Board's "normalization" of certain federal income tax deferrals resulting from accelerated amortization under the Internal Revenue Code of 1954, section 168; (4) adjustment of the test year's operating expenses to include 1958 wage increases which Hackensack was committed to pay under a union contract.
Hackensack, incorporated in 1869, is the largest private water utility in New Jersey, and presently supplies a population of about 640,000 in 55 municipalities in Hudson and Bergen Counties. Substantially the sole source of water *185 supply of Hackensack, and the only source of dependable supply is the Hackensack River and its tributaries above New Milford, New Jersey. The waters of the Hackensack River and its tributaries are stored in three reservoirs. DeForest, located in New York, is the largest, with a storage capacity of 5.6 billion gallons. Oradell Reservoir and Woodcliff Lake, in New Jersey, have a capacity of 3,080 million gallons and 889 million gallons, respectively. Through its wholly-owned subsidiary, Spring Valley, a New York corporation, water is supplied to consumers in the fast-growing southern part of Rockland County, New York. At the present time Spring Valley's water supply is obtained solely from wells. Spring Valley owns DeForest Reservoir, but does not expect to receive any water from this source for at least three or four years.
The testimony heard by the Board clearly demonstrated Hackensack's need for an additional reservoir prior to the construction of DeForest. Several experts testified that the water supply situation was "critical." The "dependable yield" of the Hackensack River and its tributaries, i.e., the amount of water which could be obtained during a critical period of extreme drought, was insufficient to meet the demands of the area served by Hackensack. One of the main functions of DeForest is to store water which would normally be wasted. The storage capacity of existing reservoirs was inadequate to save enough water during wet periods for use during drought periods; millions of gallons of water were wasted by flowing over the spillways of Oradell and Woodcliff Lake Reservoirs. When full, DeForest, with its impounded 5.6 billion gallons, is some 40% greater than the combined capacity of the two prior existing reservoirs.
Although Hackensack owned considerable land for a reservoir in New Jersey below DeForest Lake at River Vale, the testimony by engineering experts demonstrated that the best site for present construction was in the State of New York where DeForest is now located, and that that *186 site would provide the largest and most economical supply of additional water.
George H. Buck, president of Hackensack and Spring Valley, and also an engineering expert, testified that there were two persuasive reasons for building at DeForest in New York rather than at River Vale in New Jersey: (1) although Hackensack controlled the bulk of the land for the proposed River Vale reservoir in New Jersey, it controlled no land for a reservoir in New York. Mr. Buck declared that growth and development in Rockland County, New York, was proceeding so fast that if the real estate were not purchased and developed immediately it would be lost forever as a source of water supply for the inhabitants of New York and New Jersey; (2) the reservoir in New Jersey would have been much smaller in capacity and in yield, and if it had been built first it would only have met Hackensack's requirements up to about 1961 or 1962, and then a reservoir would have been necessary in Rockland County, New York. There is no indication that the means by which Hackensack proceeded to have DeForest constructed were not the most practical and economical.
In accordance with New York law, Spring Valley filed a petition with the New York Water Power and Control Commission seeking approval of the project. Hackensack had received advice from their attorneys that the most feasible legal method of constructing DeForest was to have Spring Valley, a New York corporation, undertake the construction, since Hackensack had no right to condemn in New York nor did it have any franchise rights. In its decision approving the project, the New York Commission determined that the dependable yield of DeForest was 20 million gallons a day. It required a minimum flow below the proposed dam of 7.75 million gallons a day, to which flow it added a quantity of water sufficient for the needs of the Village of Nyack of at least 2 million gallons a day, making a total minimum release of 9.75 million gallons a day, with the *187 proviso that if Nyack in the future took water from the reservoir, this 2 million gallons a day could be eliminated. Ten million gallons a day was forever reserved for the water supply needs of the residents of Rockland County through the facilities of Spring Valley.
In order for Spring Valley to take water from DeForest it must first build filter facilities. The facilities were not installed in 1957 and they will not be built until management decides to do so. The record indicates that this will not be for four or five years. Therefore, for at least that period of time, as much water as is required can be released downstream into New Jersey. The cost of DeForest, as of December 31, 1957, was $7,134,980, financed by Hackensack through the purchase of Spring Valley's securities.
Hackensack and Spring Valley made an agreement to provide for the allocation of the costs of operation of DeForest. The agreement is for a period of 35 years and provides, in general, for the following terms: Hackensack is to pay a minimum of 55.6% and a maximum of 95% of the total operating costs for any year, plus a sum sufficient to provide to Spring Valley a return of 6% per annum, free of any and all taxes based on or measured by income, upon Hackensack's Allocable Percentage of the Depreciated Cost of the Reservoir for such year. The specific charge for any year depends upon the ratio of the amount of water diverted by Spring Valley to the available yield, subject to the percentage of 55.6%. Thus, in 1957, when Spring Valley used no water from DeForest, Hackensack paid 95% of the "costs." The effect of this formula is to charge Spring Valley for a certain portion of the costs, even if it takes no water from DeForest, in view of the benefits which it obtains in having available to it an additional supply of water to which it can turn when needed. Again, in recognition of this reserve benefit, they will be charged in any year for 50% more water than they use.
We shall first consider Hackensack's appeal.

*188 I.

REFUSAL OF THE BOARD TO ALLOW THE FULL AMOUNT OF HACKENSACK'S PAYMENT TO SPRING VALLEY IN 1957.
The total charges allocated for the operation of DeForest for the year 1957 is $820,938. Hackensack has included 95% of this amount, $779,892, in its operating expenses for the year 1957. The decision of the Board, however, states, in part:
"We are convinced that DeForest is of some value to Company's present and future customers but that such charge should not be as high as 95% for the purpose of the test period. We have given consideration to the testimony of all the Company witnesses. It appears that the inter-company contract expresses the opinion of management as the ultimate division of cost and we consider that the 55.6% [$456,442] gives effect to full optimum use by both parties and that under normal and usual operations the allocation to Company should be 55.6%. Under all of the circumstances we conclude that 55.6% of the operating costs of DeForest should be included in the test period for the purposes of this proceeding."
The contract between Hackensack and Spring Valley seeks to apportion the costs of operation of DeForest to each utility upon a formula which makes the percentage of cost dependent upon the percentage of water actually drawn from the reservoir by the respective utilities, and an additional charge to Spring Valley for the benefit it derives from the assurance that its future demands for service can be met. The development of any formula, under the circumstances, must include the weighing of intangible benefits and the allocation of a monetary value to them. The conclusion must be based upon expert knowledge and opinion, particularly where it requires the ascertainment of the respective benefits enjoyed by New Jersey and New York consumers. It may well be that this is a matter in which great respect should be paid to the expertise of the Board. However, the difficulty with which this court is confronted is *189 the absence of a reasoned conclusion by the Board. The facts upon which the decision is based are not discussed. See New Jersey Bell Telephone Co. v. Communications Workers, etc., 5 N.J. 354 (1950). Nor does the Board give us the reasons leading to its determination. See 2 Davis, Administrative Law, § 16.12, p. 476 et seq. (1958). From an examination of the decision and order before us we are unable to determine the reasoning of the Board; we are unable to conclude if its action was reasonable. The matter will be remanded for further findings and reasons for the Board's conclusion that Hackensack shall be allowed only 55.6% of the operating costs of DeForest.

II.

THE BOARD COMPUTED THE FEDERAL INCOME TAXES OF HACKENSACK AS IF THE FULL ANNUAL PAYMENT TO SPRING VALLEY HAD BEEN INCLUDED IN OPERATING EXPENSES, NOTWITHSTANDING THE DISALLOWANCE OF PART OF SAID PAYMENT.
In this connection the Board stated:
"With regard to Federal Income Taxes, in the main, the Company's contention is based upon the claim that the reduced DeForest allowance would increase the taxable income of the Company.
The record shows that Company joins with Spring Valley in the filing of a consolidated Income Tax Return. As a result, inter-company transactions do not affect the calculation of taxable income. The Company alleges that we should consider the allocated income tax. This is an amount which Company calculates out of the total payment. The income tax actually paid as a result of our adjustment of the DeForest charge would not result in a change of the income tax liability. Under the circumstances, we will not accept the Company's contention and will make no adjustment in the income statement for this specific item."
Since the Board denied Hackensack certain operating expenses for rate-making purposes, Hackensack contends that *190 it will be charged with added income tax expense, and that that should be considered in computing its return. This adjustment was denied because the two utilities file a consolidated income tax return and the Board concluded that the inter-company transaction would "wash out" since the income of one would be offset by the expense of the other. Although the Board's conclusion is correct, its reasoning in this instance is fallacious.
Both Hackensack and Spring Valley are regulated public utilities, each having its own separate customers in separate states. Each is subject to regulation by the appropriate board of the state within which it is functioning. Therefore, the two companies should be treated as separate entities for rate-making purposes. It is true that the consolidated income tax liability of the two companies would not be changed by a reduced inter-company payment on account of DeForest Lake. But it is not true that the income tax liability of Hackensack as a separate and distinct entity  which should be the only liability relevant in a case involving Hackensack's rates  would not be changed.
However, the decision and order of the Board disallowing Hackensack from taking credit for rate-making purposes for the expense of DeForest did not abrogate the terms of the inter-company contract. Hackensack continues to be liable for the payments called for under the agreement. It is therefore entitled to claim full credit for this expense for federal income tax purposes. In reality, there will be no change in the allocation of DeForest expenses (except for rate-making purposes) and thus there will be no change in the federal income taxes paid as a result of the Board's adjustment for rate-making purposes. The Board's allowance of income taxes was therefore correct. Its calculation was based upon the actual allocation of expenses between the two companies for the year 1957.
We shall next consider the appeal by rate counsel.

*191 III.

THE BOARD APPLIED THE AVERAGE 1958 INVESTMENT RATE BASE TO 1957 OPERATING REVENUE FIGURES.
Rate counsel objects to the inclusion in the rate base of any 1958 capital expenses. Hackensack will spend $3,000,000 on capital improvements in 1958; the majority of these items will not be revenue producing. Not all of the $3,000,000 was included in the rate base. The Board averaged the balances of fixed capital at the beginning and end of the year, and included only $1,500,000. In his argument rate counsel assumed that 1958 revenues would be higher than comparable figures for 1957. He therefore contends that the use of a 1958 rate base in connection with 1957 operating revenue figures has the tendency to reflect a much lower rate of return than would be the case if the rate base and operating revenue figures of the same year were used. However, since most of the improvements were non-income producing and Mr. George H. Buck, president of Hackensack and Spring Valley, testified that 1957 was an abnormally dry year resulting in drafts about 5% in excess of normal growth, the Board could have reasonably determined that 1958 revenues would not exceed those of 1957.
In its recent decision in State v. New Jersey Bell Tel. Co., 30 N.J. 16 (1959), wherein it was argued that the Board was in error in relating 1957 (the test year) expenses and earnings data to a rate base calculated upon 1958 net investment, the Supreme Court, at pages 29, 31, 36, held that:
"So long as the determination of the rate base reflects the reasonable judgment of the Board and is grounded upon sufficient relevant and competent evidence, it is not the judicial province to interfere in what is essentially a legislative function. * * * [There is a] wide area of discretion vested in the Board in determining the fair value of a utility's property. * * *
*192 Thus, we cannot, as an abstract proposition, say that the Board's determination to calculate the fair value of the company's property by reaching outside of the test years and including 1958 average increase in net investment is erroneous as a matter of law. * * *
We recognize that rate making is by necessity a predictive science, for the rates of tomorrow are fixed on the facts of today. The Board is obliged, as an ultimate standard, to establish rates `sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties.' Public Service Coordinated Transport v. State, supra, 5 N.J. [196] at page 225. * * *
* * * It is only requisite that the formula adopted be, from the reasoning of the Board, based upon the evidence presented, i.e., its expertise in these matters, rationally related to the problem attacked."
Our reading of the Bell Telephone case, supra, leads us to conclude that the list of problems sought to be remedied by the Board is not exclusively limited to those of attrition and inflation, but may include any situation for which the Board reasonably concludes that recognition should be given. See Plainfield-Union Water Co. v. Board of Public Utility Commissioners, 57 N.J. Super. 158 (1959), decided this day.
Since, in the case before us, the Board has clearly demonstrated in its decision and order that the application of the 1958 investment rate base to 1957 operating revenue was rationally and reasonably related to the problem of establishing a formula, there is no legal obstacle to its adoption. The Board stated:
"[O]f the $3,000,000 of estimated fixed capital to be expended for the year 1958, approximately $1,580,000 is for recurring items and $1,444,000 for non-recurring items. The majority of the items are not revenue-producing and we believe they should be given a consideration in a determination of rate base."
In the light of the Board's expert finding that a major portion of the 1958 improvements were non-income producing, it is entirely reasonable that a portion of such *193 capital expenses, not to exceed the amount to be expended for non-income producing improvements, should be included in the rate base.

IV.

THE BOARD PERMITTED 1958 WAGE INCREASES TO BE ALLOWED AS AN ITEM OF OPERATING REVENUE DEDUCTION.
Rate counsel argues that if the figures in computing Hackensack's net income are to have any validity they must all relate to the same period of time, the test year. The discussion under III, supra, applies here as well.

V.

THE BOARD PERMITTED HACKENSACK AN ALLOWANCE OF 55.6% OF THE OPERATING COST OF DeFOREST.
Rate counsel initially argued that Hackensack should be allowed no more than 38.75% of DeForest's operating cost, or, in the alternative, nothing at all. He now contends that the payments in question should be disallowed in toto. He is clearly wrong in his statement that 7.75 million gallons per day which the New York Commission required to be released from DeForest for the benefit of downstream users did not constitute an allocation of additional water made available by the reservoir. 7.75 million gallons per day was the minimum flow required by the New York Commission. The low flow of the river before DeForest was as little as 1.9 million gallons per day. Rate counsel's calculations were therefore based upon a fact situation distinct from that presently before us. The issue of 55.6% of DeForest expenses allocated to Hackensack by the Board has been treated under I, supra.

*194 VI.

THE BOARD PERMITTED NORMALIZATION OF INCOME TAXES FOR ACCELERATED AMORTIZATION DEDUCTIONS TAKEN BY HACKENSACK PURSUANT TO THE INTERNAL REVENUE CODE OF 1954, SECTION 168.
By the authority of the provisions of section 168, which permit an election to take higher depreciation deductions for federal income tax purposes during the early life of certain of its property certified as emergency facilities for the national defense, Hackensack is amortizing $386,623.62 over a period of five years. The cost of these facilities will be completely amortized by June 30, 1959. The Internal Revenue Code of 1954 does not change the fact that the cost of the property can be depreciated for income tax purposes; only the timing of the depreciation deduction has changed. Due to this large amortization expense, Hackensack's federal income taxes will be less during the five-year period (all other things being equal). After that, however, there will not be permitted any further amortization deductions for these facilities and the federal income taxes of Hackensack will be increased accordingly.
By "normalizing" its federal income tax to compensate for accelerated amortization, Hackensack has continued to depreciate its assets on its books by the straight-line method, and thereby ignores the accelerated write-off and accompanying income tax saving. That is, Hackensack has charged to a sub-account "Provisions for Deferred Federal Income Taxes" and credited to a sub-account "Reserve for Deferred Income Taxes" an amount equal to income taxes deferred due to the benefits of section 168. When the depreciation allowances for any one year's additions are less than they would have been under straight-line depreciation, Hackensack proposes to reverse the above accounting procedure, and the excess tax payment will be credited to "Provision for Deferred Federal Income Taxes" and debited to "Reserve *195 for Deferred Federal Income Taxes." Thus, the Board permitted Hackensack to include $37,193 as an item of operating expenses for 1957 federal income taxes which it did not pay, but which it would have paid had it not been permitted to accelerate its amortization deductions under section 168.
The above accounting procedure was supported by the expert testimony of Mr. F. Merrill Beatty, a certified public accountant. He analogized the benefits of section 168 to an interest-free loan by the Government to Hackensack. Since Hackensack pays less federal income tax due to increased depreciation deductions during the early life of the property, it can retain cash to invest in expanded facilities. Such funds are then returned to the Government in later years in the form of increased income taxes. Mr. Beatty testified:
"I believe that the allowance of the deferred taxes in cost of service will permit the Company to use the cash that Congress intended it to have.
It will also be the most equitable from the consumers' point of view since it results in no change in rates. Present and future customers are protected since each are receiving the Federal income tax benefits applicable to the costs they pay for and only such income tax benefits."
This is clearly a situation where proper deference must be accorded to the judgment of those trained in the field of public utility regulation. The Board has seen fit to permit "normalization" of Hackensack's income taxes for accelerated amortization deductions; expert testimony was introduced to demonstrate the fairness of this treatment. Rate counsel makes no rational argument as to why this decision is improper. We shall, therefore, not disturb it.
Remand for findings and conclusions conforming with this opinion. The court retains jurisdiction in the interim. The appeal may be noticed for further argument on supplemental briefs after the Board makes its supplemental findings and conclusions. No costs.