IN THE MATTER OF THE BOARD'S INVESTIGATION OF TELEPHONE COMPANIES PROVIDING INTRASTATE SERVICE IN NEW JERSEY OF A PROPOSED COMPREHENSIVE ADJUSTMENT CLAUSE. RATE COUNSEL, APPELLANT, v. NEW JERSEY BELL TELEPHONE COMPANY AND THE BOARD OF PUBLIC UTILITY COMMISSIONERS OF THE STATE OF NEW JERSEY, RESPONDENT.

Argued September 23, 1974—Decided February 10, 1975.

Mr. *John G. Graham* argued the cause for appellant (*Messrs. William E. McGlynn, Jack B. Kirsten and John G. Graham,* Rate Counsel, Department of Public Advocate, attorneys).

*Mr. Michael J. O'Neil* argued the cause for respondent, New Jersey Bell Telephone Company (*Messrs. Michael J. O'Neil and Richard C. Schramm,* attorneys).

The opinion of the Court was delivered by

HUGHES, C. J. This appeal, by rate counsel appointed to represent the public,[1] challenges the validity of two orders entered respectively on December 13 and December 20, 1973, by the New Jersey Board of Public Utility Commissioners (hereafter "PUC" or "the Board"), under PUC Docket No. 732–134. The December 13 order would authorize a public utility to install in its tariff schedule a "Comprehensive Adjustment Clause" (hereafter sometimes "CAC") to recover certain expenses as they increase, by way of yearly increases in its rates.[2] The December 20 order accepted a tariff sheet responsive to such earlier order, providing for annual adjustments in rates under such clause, effective in the first year for billings after January 1, 1974, to yield during that year $17,023,000 in increased rates. A motion by rate counsel for reconsideration and stay of such orders was denied by PUC. Having filed an appeal with the Appellate Division, rate counsel were unsuccessful in obtaining from it a stay of the orders. Thus the increased rates went into effect, and were collected during 1974. Under *R.* 2:12–1, this Court, on its own motion, while the matter was pending unheard in the Appellate Division, brought the case here by direct certification, by its order of May 14, 1974. For the issue to be discussed effectively, some additional procedural history is necessary.

---

[1] *N. J. S. A.* 48:2–31.1, superseded by *L.* 1974, *c.* 27, creating the Department of the Public Advocate.

[2] This would represent the initial use in New Jersey, possibly in the country, of such a broadly comprehensive adjustment clause.

On January 13, 1972, under its Docket No. 709–494, PUC, after final hearings (under *N. J. S. A.* 48:2–21[3] and *N. J. S. A.* 48:2–21.1[4]) granted intrastate rate increases to New Jersey Bell Telephone Company (hereafter "Bell" or "the company") in amounts intended to provide a return on its property rate base of 7.93 percent, deemed to be "just and reasonable" in the sense of the statute.

Bell, on February 28, 1972, under PUC Docket No. 722–153, filed a new rate increase petition contending (while it in no way considered the previously designated rate of return of 7.93 percent to be adequate) that it faced such increases in expenses including wages, maintenance, materials and supplies, taxes and other operating costs that the levels of the increased rates would not permit it to earn in 1972 the 7.93 percent rate of return, and that it should have interim rate relief to permit it to do so. Under *N. J. S. A.* 48: 2–21.1, *supra,* PUC has authority to negotiate such temporary increases pending the full "rate case" proceeding. Having suspended the suggested increased rates temporarily

---

[3]*N. J. S. A.* 48:2–21 provides, under subsection (b):
The board may after hearing, upon notice, by order in writing:
1. Fix just and reasonable * * * rates * * *.

[4]48:2–21.1. *Adjustment of rates during pendency of hearing*
The board may, during the pendency of any hearing instituted by it, on its own initiative or on petition, in which the approval or fixing of just and reasonable individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage or other special rates is in issue, or at any other time, negotiate and agree with any public utility for an adjustment of the individual rates, joint rates, tolls, charges or schedules thereof, as well as commutation, mileage or other special rates for any product or service supplied or rendered by such public utility. Such adjustment may be for, or without, a specified limit of time. In no event shall any such adjustment be regarded as contractual. Such adjustment shall at all times be subject to change through the proceedings provided for by this chapter, or through negotiation and agreement under this section. The board as a part of any such negotiation and adjustment shall provide for the continuance, suspension or other disposition of any hearing of the character aforesaid then pending. Amended by *L.* 1962, *c.* 198, § 14.

as it was permitted to do under *N. J. S. A.* 48:2–21(d), PUC had conducted no less than 19 hearings by July 7, 1972. On July 20, 1972, after full adversary proceedings in which rate counsel representing the public and other representatives of the public were heard, PUC concluded that no "interim" rate relief should be granted. Despite its finding that Bell's rate of return would suffer attrition during 1972 which would bring it down to 7.12 percent, it saw Bell as not being confronted by an immediate emergency of the type which had justified PUC in granting such interim relief in other cases.[5]

The 722–153 proceeding then went on to the Board's order of December 29, 1972. PUC, having determined the rate base of Bell and other elements as required (*Public Service Coord. Trans. v. State*, 5 *N. J.* 196 (1950)) determined that a fair and reasonable rate of return on such base would be 8.15 percent. Finding that Bell's existing rates yielded $96,241,000 in *pro forma* operating income representing a return of 6.37 percent, less than a fair rate of return on its base, PUC approved a tariff designed to produce increased rates to bring the level of net operating income to $123,175,000 which would yield the determined fair and reasonable rate of return of 8.15 percent.

PUC then projected in such order of December 29, 1972, the rate regulation technique[6] which, as will be indicated, is

---

[5]The Board has recently negotiated interim increases in rates in some major rate proceedings. The negotiated increases were based upon the critical need for electrical energy because of inadequate generation and the immediate inability to finance construction of scheduled generation facilities or for other emergent purposes. In those cases rate counsel agreed that there was a need for some interim relief * * *. [PUC Order of July 20, 1972, in Docket No. 722–153]

[6]In recognition of economic conditions and the resultant financial straits into which utilities have been forced, the Board proposes to initiate a comprehensive adjustment clause. This clause will be designed to make rate regulation more responsive to the financial needs of a utility, which is required to provide safe, adequate and

the gravamen of rate counsel's appeal in the case presently before us.

While PUC recognized that it could allow a fixed dollar amount of rate relief which would provide the financial needs of the company over a reasonable future period, it preferred the new method as reflecting a benefit to consumers.[7]

PUC pictured the duration of its "comprehensive adjustment clause" as being measured by the period during which the formula would be necessary, and would operate effectively, and it said:

> At no time would the adjustment, which is described subsequently in great detail, provide a rate of return in excess of 8.30% * * *. The 8.30% rate of return compares with the 8.15% allowed by this order and would be permitted in recognition of some future years of operation at rates of return which are less than 8.15%. The Board further offers this .15% differential as an incentive for efficient management. The first annual adjustment under this provision would be implemented no earlier than January 1, 1974, based on independent certified audited statements for the twelve-month period ending June 30, 1973. [PUC Order of December 29, 1972, in Docket No. 722–153]

The Board in its order then described the comprehensive adjustment clause as including four categories of expense: (1) salaries and wages including fringe benefits, (2) depre-

---

proper levels of customer service. The clause will be adopted after appropriate procedures consistent with the Administrative Procedure Act of this state and the applicable rules and regulations of this agency. Proper notice will be given in order that interested parties, including the public, may be heard. It is expected that these proceedings will be instituted within a short time after the issuance of this order, which completes proceedings before the Board *involving Phase I of this case.* [PUC Order of December 29, 1972, in Docket No. 722–153; emphasis supplied]

[7]The Board, however, with the adoption of the adjustment clause could allow a smaller current amount plus the adjustment clause because the closer matching of operating costs and allowable revenues would be advantageous to the consumer, who would face more gradual increases in his charges for service. Customers, who bear the cost burden of rate matters, would further benefit from a decline in the number of proceedings. [PUC Order of December 29, 1972 in Docket No. 722–153]

ciation charges, (3) other expenses, and (4) taxes. Their propriety was intended by PUC's order of December 29, 1972, to be subject to constant surveillance by PUC and to be defeasible by order of the Board when economic trends would reach a point at which the continued functioning of the clause no longer would be necessary. As it said in its order:

Although the adjustment clause would be written in anticipation of more moderate, but continuing, economic trends, the allowances would become inoperative if the Board's review of annual audited figures reveals a satisfactory level of revenue. The Board's surveillance program and the 8.30% rate of return limitation incorporated in the clause ensure that any appropriate downward adjustments in revenues would be implemented promptly. [PUC Order, Docket No. 722–153, December 29, 1972]

As has been noted the comprehensive adjustment clause would be implemented no earlier than January 1, 1974, this timetable having accommodated the procedure which the Board had envisaged in order to finalize and make precise the design of the comprehensive adjustment clause to be put into effect. That procedure was commenced on February 15, 1973, when PUC entered its "Order Initiating Investigation" which contemplated public hearings to explore and confirm the opinion it had stated in its December 29, 1972, order in Docket No. 722–153 that:

[t]he public interest might be best served if an automatic adjustment clause were included in telephone companies' tariffs to provide interim relief or adjustment based upon costs which are beyond the direct control of the utility.

Although a different docket number, 732–134, was assigned to the later proceeding (argued by Bell to be "happenstance" and immaterial, and by rate counsel to be substantial and meaningful), we see in it a clear nexus to the former case. The Board certainly viewed this link as existent, as indicated in the preface to its Order of February 15, 1973 — "[i]n the Board's Order of December 29, 1972

in connection with the establishing of rates for New Jersey Bell Telephone Company, on an interim basis in Docket No. 722–153, * * *" and in other references to "Phase I" and "Phase II" of the latter proceeding.

By its formal "Opinion Supporting Order Dated December 29, 1972" PUC particularized its findings and further indicated the continuum of the substance of Docket No. 722–153[8] and from this we note the Board's obvious inten-

---

[8]In our order dated December 29, 1972, on pages 3 and 4 we go through great effort to explain the reasoning behind the acceptance at that time, of a selective rate increase application as opposed to a surcharge or percentage increase across-the-board.

In considering the proposed rates to implement the increase which we found to be fair and reasonable, we gave consideration to the proposals advanced by Rate Counsel and petitioner. We considered the fact that we had decided, and it was stipulated to by the parties to separate this case into Phase I and Phase II. This consideration had a bearing on our decision to allow a selective rate increase at that time. We felt that if any inequity was discovered during the Phase II hearings the Board could recognize these inequities and deal with them at the end of the Phase II proceeding without disturbing other rate relationships which may at the present time be reasonable. We were also concerned that the implementation of a surcharge at this time could work contrary to implementing reasonable basic exchange rates. It could have placed an even greater burden on our larger cities, which at the present time are undergoing a period of financial crises.

Rate Counsel submits that there should be an indepth exploration of the entire rate structure developed by petitioner. We agree with Rate Counsel that the various principles employed by petitioner in developing its rates should be reviewed and for that reason we entered an order dated August 8, 1972, directing the parties to this proceeding to submit proposals for developing cost studies. *This aspect is presently in the hearing stage.* Our agreement with the development of a cost of service study demonstrates our determination to explore fully suggestions, objections and alternatives proposed by Rate Counsel and other parties to the proceeding. [emphasis supplied]

*     *     *     *     *     *     *     *

We reaffirm our position as stated above and find that a selective increase as approved in our order of December 29, 1972, is fair and reasonable at this time. This would not preclude us in the future to restructure the rates of petitioner, pending a review and consideration of the evidence to be produced in the Phase II proceedings in

tion that the increased rates yielded by the adjustment clause would always be defeasible, on review of their legitimacy.

Meanwhile hearings on the ambiguously docket-numbered 732–134 proceeding continued, resulting in the Board's Decision and Order of December 13, 1973 and its Order Accepting Tariff Revisions validated thereby of December 20, 1973 (the orders under attack on this appeal). PUC on December 13, 1973, restated the reasoning which led to such proceeding.[9] It referred to public rate counsel's attitude with respect to the adjustment clause and their doubts concerning procedure in its adoption.[10] It equated the new ad-

this matter. [PUC Opinion Supporting Order Dated December 29, 1972, Docket No. 722–153, May 16, 1973]

[9]In the Board's order of December 29, 1972, in connection with the establishing of rates for New Jersey Bell Telephone Company, in Docket No. 722–153, the Board indicated that in its opinion the public interest might be best served if a comprehensive adjustment clause were included in telephone companies' tariffs to provide interim relief or adjustment based upon costs which are beyond the direct control of the utility. [PUC Decision and Order, Docket No. 732–134, December 13, 1973]

[10]Rate counsel filed a memorandum of law expressing its conclusion that it has some reservations about the validity of the use of a comprehensive adjustment clause, but recommends that the Board adopt the comprehensive adjustment clause designed to flow through only those increases in the per unit cost of operations which are beyond controversy, and which will not tend to distort the relationship of operating expenses, revenues and rate base. Rate counsel believes that the clause should be adopted on an experimental basis for a limited period so that the Board may review its operation over that period.

\*     \*     \*     \*     \*     \*     \*     \*

\* \* \* rate counsel indicated that the statute raises the question as to whether or not the Board has the power to allow an increase in rates other than "after hearing, upon notice."

\*     \*     \*     \*     \*     \*     \*     \*

Rate counsel recommends that this adjustment clause be adopted on an experimental basis. This Board concurs with this recommendation and will adopt this clause on an experimental basis to be reviewed periodically for any changes. [*Id.*, Decision and Order, December 13, 1973]

justment clause with the long-established fuel adjustment clause.[11] It carefully delineated the four categories of expense subject to the new clause and elaborate precautions with regard to its surveillance.

Our review of the expense categories of CAC indicates to us, without going into their detail, two significant factors. First, in total they return to the company considerably less than actual increases in its costs.[12] Second, the components of the various categories as representing recoverable expenses are, in their details, well within the range of economic expertise and jurisdictional capacity of the Board, given the basic validity of the CAC concept itself.

The PUC order of December 20, 1973, contemplated that the CAC would be implemented each year.[13] As we have indicated PUC had, on December 27, 1973, denied rate counsel's motion for rehearing and stay of the instant orders, seeing "* * * no merit in staying the rates, authorized on an

---

[11]The Board feels that the approach adopted herein is similar to fuel adjustment clauses generally, which have long been held to be appropriate in this State and other jurisdictions in the U. S. The major electric utilities in New Jersey have long had fuel adjustment clauses as part of their tariffs and the major gas distribution utilities in the State have long had purchase adjustment clauses which have the same effect. [*Id.*, Decision and Order, December 13, 1973]

[12]*Salaries and Wages*

This area of Bell's expenses increased approximately $26,672,000 or 11.68%. Under the CAC, $5,022,000 or 2.2% will be passed on to the consumer. * * *

*Depreciation*

This area of Bell's expenses increased approximately $9,148,000 of which $5,342,000 will be passed through under the CAC. * * * [PUC "Interlocutory Decision Authorizing Implementation of the Comprehensive Adjustment Clause," Docket No. 747–522, December 26, 1974]

[13]This tariff sheet indicates that N. J. Bell's tariff will be adjusted annually based upon changes, as outlined in the Board's decision and order, in the four categories of expenses during the preceding twelve month period ending September 30 in each calendar year, commencing with September 30, 1973. [PUC Order Accepting Tariff Revisions, Docket No. 732–134, December 20, 1973]

experimental basis to become effective for bills rendered on and after January 1, 1974, and finds no merit in reconsideration until such experiment has been conducted and evaluated." Thus the clause, absent its withdrawal or possible stay in operation, would ordinarily remain in effect, of course to yield higher increases responsive to continuing inflationary pressures to be felt in 1975, as signalled in 1974.

By way of more recent history, not formally of record herein but sufficiently publicly of record to be here noticed, Bell on July 18, 1974, filed a new rate increase proceeding under PUC Docket No. 747-522, asserting such substantial and serious impact upon it of inflationary costs that even with the yield of the comprehensive adjustment clause it faced an attrition factor bringing its rate of return far below 8.15 percent, the amount earlier determined to be "just and reasonable" and the lower limit of what later came to be regarded in the record as a rate of return range (8.15 percent to 8.30 percent) representing a "just and reasonable" return.[14] The company saw its predicament as endangering its ability to maintain adequate communication services in New Jersey, to attract investment capital and to insure continued financial integrity. While Bell asserted its need for much higher permanent increases in rates (an issue still pend-

---

[14]On the question of whether PUC fixed (as sometimes indicated in the record) 8.15 percent as a just and reasonable rate of return or intended (applying the factor of operation of CAC) to express its determination that 8.15 percent—8.30 percent represented a just and reasonable rate of return "range," we see no particular legal significance, given the validity of the comprehensive adjustment clause itself. For, on the former hypothesis, it was within the Board's power "to increase the otherwise allowable rate of return," *State v. N. J. Bell Tel. Co.*, 30 *N. J.* 16, 35 (1959), and thus account for the problems of inflation and attrition. Alternatively, assuming that a range of reasonableness was intended, such an approach also would be legally unexceptionable. This Court in *State v. N. J. Bell Tel. Co.*, *supra*, at 22, recognized with composure that PUC had declared "[t]hat a fair rate of return would be in the range of 6% to 6.37%," remanding the case to PUC for completion of fact-finding on other questions.

ing unresolved before PUC), it sought interim relief by increased rates of $40.7 million. Rate counsel opposed this request and PUC denied it on September 12, 1974.

On December 2, 1974, Bell again appealed for interim rate relief, projecting an emergent proposed decision to freeze hiring, promotions and new contracts, portraying these desperate measures as sure to affect service and in the long run to raise customer costs. Asking PUC to consider the implications (relating to its capacity to fulfill its public responsibilities for rendition of service) of such capital and labor retrenchments, it asserted that despite the yield of the comprehensive adjustment clause, its return for the annual period ending March 31, 1974, was 7.84 percent, falling to 7.61 percent at September 30, 1974, and projected, without relief, to decline to 6.93 percent at June 30, 1975.

Bell contends, of course, that it is confronted with a financial emergency threatening its capacity to serve the public and that it is thus in a position not unlike other utilities whose capacity to render service has been considered to be in peril.

Hearings were had before PUC on the December 2, 1974, "emergency" application for interim rate relief above and beyond the expected yield of CAC for 1975. Rate counsel and others again mounted a vigorous attack upon the comprehensive adjustment clause, seeking to prevent its implementation on January 1, 1975. On December 26, 1974, PUC in a majority decision (carefully designated as being "interlocutory" in nature, expressing deference to this Court's pending consideration of this appeal, not reaching the request for interim increase in general, but focusing on the validity of the comprehensive adjustment clause) restated its belief in the integrity of the clause as a regulatory tool,[15]

---

[15]CAC is particularly well adapted, subject to the ultimate determination of its lawfulness by the Supreme Court, to permit petitioner to adjust to expenses attributable to inflation with minimal adverse effect on the consumer. As is discussed in greater detail below, CAC

pointed out, as we have seen, that it enables Bell to retrieve only a portion of some of its increased operating expenses, and determined that it should continue to be effective in 1975.[16]

In this posture we reach the fundamental question before the Court — the validity of the comprehensive adjustment clause founded on the bruited orders of December 1973. Rate counsel suggests procedural deficiencies in the adoption of those orders and beyond that the lack of statutory authority (although rate counsel earlier had encouraged adoption of a comprehensive adjustment clause, as we have seen) for the CAC itself; questioned also is the application of such an adjustment clause to rates on a *pro forma* basis.

██ We note rate counsel's objection on procedural grounds, contending that no rate proceeding was actually "pending" at the time of entry of the December 1973 orders, and that no statutory or due process foundation for them

---

permits petitioner to recover a portion of certain enumerated expenses, the most costly of which is salary increases. We note that in 1974 petitioner was required to negotiate new contracts with the labor unions representing its employees. Recovery of the expenses attributable to those salary increases is in the interest of those employees, petitioner and, we believe, the public. Thus viewed, we believe the most practical approach consonant with our respect for the Supreme Court to decide the legality of CAC is to continue CAC until a decision by that court and further order of this Board. [PUC "Interlocutory Decision Authorizing Implementation of the Comprehensive Adjustment Clause," Docket No. 747–522, December 26, 1974]

[16]Accordingly, based upon a review of the entire record, we *FIND*:
1. Petitioner is presently before this Board requesting approval of increased rates in the amount of approximately $155 million per year.
2. Of that amount approximately $19,365,000 is sought to be obtained through implementation of the CAC in the year 1975.
3. The CAC was authorized by the Board as a valid means of rate relief in Docket No. 732–134 on December 13, 1973.
4. The clause should be continued, pending a decision by the Supreme Court of New Jersey and until further order of the Board.
[*Id.*, Decision of December 26, 1974]

could have existed absent their enclosure (and consequent subjection to supervision) within a formal rate proceeding. To say that no proceeding was pending in December 1973 is to argue that the December 29, 1972, order ended that rate proceeding. The record seems to us to be replete with evidence to the contrary. Such finality was certainly not intended by PUC which considered it only as ending "Phase I" of the proceeding.[17]

Thereafter, when the time came for PUC to file its "Opinion Supporting Order Dated December 29, 1972" which was filed on May 16, 1973, there were further references indicating such continuity.[18]

---

[17][T]he parties will not be able within a reasonable future period * * * to complete the record in respect to the other issues * * *. The petitioner and rate counsel have agreed that it would be appropriate and reasonable for the Board to determine those issues to which the record is complete and, based thereon, to determine the appropriate rate base, operating revenues and expenses, net operating income and rate of return, and the additional revenue requirements of petitioner, if any, *at this stage* of the proceedings. We concur in this stipulation. Further, we shall reserve to the parties the opportunity to explore those matters which may be related to rate design, rate structure, * * *. [emphasis supplied]

\*   \*   \*   \*   \* .   \*   \*   \*

The Board has decided to separate this case into Phase I and Phase II * * *; if any inequities develop during the later hearings, the Board will recognize these inequities and deal with them at the end of the stated hearings without disturbing other rate relationships that have existed for many years.

The Board has concluded that it is appropriate to make the determination in respect to revenue requirements based upon its findings as to rate base, operating income, and rate of return *at this stage* in the proceedings and to reserve to the parties the opportunity to complete the record in respect to the other issues * * *. [PUC Order, Docket No. 722–153, December 29, 1972; emphasis supplied]

[18]In Rate Case I, we discussed this point in detail * * *.

\*   \*   \*   \*   \*   \*   \*   \*

In Rate Case I, we allowed an amount for cash working capital * * *.

\*   \*   \*   \*   \*   \*   \*   \*

In considering the proposed rates * * * we gave consideration to the proposals advanced by Rate Counsel and petitioner. We con-

Again, it is instructive to note the Board's order of September 12, 1974, in the new proceeding (bearing Docket No. 747-522) which granted a motion to dismiss the interim application of Bell. In acknowledging rate counsel's motion to rescind the adjustment clause (which motion had been denied on September 5, 1974) the Board stated:

> However, the Board ruled that Rate Counsel will be allowed to renew this motion during the main part of the case to insure a full investigation into the operation of the adjustment clause to date.

So too, the Board in rejecting Bell's request for an immediate increase in rates sufficient to raise its rate of return to the level allowed in the order of December 29, 1972, further stated that it would "determine a fair rate of return in the main proceedings."

It is plain to us that the nexus between the 722-153 and 732-134 proceedings, as well as the relationship between them and the new 747-522 proceeding, have provided the fullest due process to the public, particularly in view of the vigorous and able participation of rate counsel representing the public in all of such proceedings. Under any realistic view of

---

sidered the fact that we had decided, and it was stipulated to by the parties to separate this case into Phase I and Phase II. This consideration had a bearing on our decision to allow a selective rate increase at that time. We felt that if any inequity was discovered during the Phase II hearings the Board could recognize these inequities and deal with them at the end of the Phase II proceeding without disturbing other rate relationships * * *.

Rate Counsel submits that there should be an indepth exploration of the entire rate structure developed by petitioner. We agree with Rate Counsel that the various principles employed by petitioner in developing its rates should be reviewed * * *. This aspect is presently in the hearing stage.

\*       \*       \*       \*       \*       \*       \*       \*

We reaffirm our position as stated above and find that a selective increase as approved in our order of December 29, 1972, is fair and reasonable at this time. This would not preclude us in the future to restructure the rates of petitioner, pending a review and consideration of the evidence to be produced in the Phase II proceedings in this matter. [Id., Opinion Supporting Order, May 16, 1973; emphasis supplied]

492

the continuity of these proceedings it would seem to us to be an exercise in semantic rigidity to suggest that there was no rate proceeding "pending" when the December 1973 orders were entered. As has been seen, PUC has never evinced any purpose of disassociating the year-by-year yield of the comprehensive adjustment clause from final scrutiny at a later stage in the proceedings. It has most recently indicated to the contrary in its Interlocutory Decision of December 26, 1974, *supra*, as follows:

The Board will make a final determination as to the CAC in this docket as may be proper under any mandate or opinion that may be handed down by the Supreme Court and after consideration of the entire record made in this proceeding. In the event the court or the Board should determine that the clause is illegal or that excessive revenues are produced by operation of the clause, appropriate adjustments or customer credits may be made. [PUC Interlocutory Decision, December 26, 1974, *supra*]

We are thus convinced that, so far as protection to the public is concerned, these proceedings (as they involve the validity of the comprehensive adjustment clause) should be viewed as a unit, to the end that the recovery of expenses through the CAC shall be conditionally permitted subject to final validation in the terminal phases of the proceeding in which PUC will be required to fix just and reasonable rates on a permanent basis; at that time PUC should provide for appropriate adjustments, customer credits or refunds, if the evidence indicates that any excessive revenues have been produced by the operation of the clause.

Although we need not reach the issue, in light of our holding as to the scope of the phrase "during the pendency of any hearing," *N. J. S. A.* 48:2–21.1, it may be noted that even assuming, *arguendo*, that this phrase is limited in scope to its conventional construction, *see, e. g., In re Intrastate Industrial Sand Rates*, 66 *N. J.* 12 (1974), it would not necessarily follow that the adoption of the CAC was beyond the statutory authority of PUC. Under *N. J. S. A.* 48:2–21.1, *supra*, the Board is authorized during the pendency

of a rate proceeding "or at any other time" to "negotiate and agree with any public utility" for an adjustment of rates either for a specified term or otherwise. *See, In re N. J. Power & Light Co.,* 15 *N. J.* 82, 96 (1954). This would remain subject always, however, to the basic statutory requirement of final adjudication of the components of "just and reasonable" rates (*In re Intrastate Industrial Sand Rates, supra*) even if it required the contemporaneous institution on PUC initiation of a formal rate proceeding, for which there is ample statutory authority. Aside from the provisions of *N. J. S. A.* 48:2–21.1, *supra,* another section of the statute, *N. J. S. A.* 48:2–19(a) authorizes the Board to "[i]nvestigate upon its own initiative or upon complaint in writing any matter concerning any public utility;" and *N. J. S. A.* 48:2–21(d), *supra,* provides that "[w]hen any public utility shall increase any existing * * * rates * * *, the board, either upon written complaint or upon its own initiative, shall have power after hearing, upon notice, by order in writing to determine whether the increase, change or alteration is just and reasonable."

▮ We do not see in this case the pejorative connotation given to "rate making experiments" in *In re N. J. Power & Light Co., supra,* for, assuming the range of 8.15 percent to a ceiling of 8.30 percent to be reasonable, the allowable increases accommodated by the clause could never be in excess of "just and reasonable rates." Nor is there here involved anything like the surtax condemned in that case (because in recapturing past rate deficiencies, it laid on present and future customers burdens which should have rested on those of the past). On the contrary it seems apparent that, assuming final adequate fact-finding as to the legitimacy of the expenses recovered, the adjustment clause represents a rational and reasonable attempt to provide for the overall impacts of inflation, for the mutual protection of the utility's capacity to serve and the customers who depend upon (and pay for) that service.

While on the question of the validity of a comprehensive adjustment clause we stand on largely uncharted ground, we notice that in the older Bell case, *State v. N. J. Bell Tel. Co.*, 30 *N. J.* 16 (1959), this Court spoke of the problem of "regulatory lag" in utility rate cases,[19] seeming to encourage temporary allowance for attrition in a variety of ways, not being bound to any one particular formula. This for the reason, as emphasized in that case by Justice Burling writing for this Court, that rate making is a predictive science and adjuring the Board, as an ultimate standard, to establish rates "sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties," citing *Public Service Coord. Trans. v. State, supra*, 5 *N. J.* at 225.

An example of such flexibility in practice may be noticed in a PUC ruling in the instant case vis-a-vis a technique conditionally approved in *State v. N. J. Bell Tel. Co., supra*. In the latter the Court considered an increase of some $25.5 million in the rate base of Bell to counter the effect of attrition and remanded to the Board only for the purpose of finding additional facts to support such technique. In the present case PUC rejected that method,[20] choosing instead to meet the inevitability of inflation and attrition by the comprehensive adjustment clause.

---

[19]Regulatory lag is the loss of proper earnings claimed by the utility between the time that a petition for a rate increase is filed and the rate relief actually becomes effective by administrative or judicial determination. [*State v. N. J. Bell Tel. Co.*, 30 *N. J.* at 28]

[20]*Attrition Adjustment*

The petitioner requested that its rate base be increased by a factor representing an adjustment to recognize *additions at higher unit costs* in the amount of $111,740,000. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

\* \* \* [N]o allowance will be made in our calculation of rate base for item of "attrition" in the amount of $111,740,000. [*Id.*, Opinion Supporting Order, May 16, 1973]

Viewed as being an interim increase within the contemplation of *N. J. S. A.* 48:2–21.1, *supra*, the effect of the clause to increase rates from year to year seems to us to have, or (with a record of more precision) to be capable of having, the requisite certain relationship to examination in the context of the final determination on the full rate case. This Court recently commented on the indispensable "legal umbilical cord" between a temporarily increased rate and the final adjudication of the firmly established and traditional components which enter into the determination of "just and reasonable" rates. *In re Intrastate Industrial Sand Rates, supra,* 66 *N. J.* at 25. Fortuitously, as we have seen, the state of the present litigation is such as to accommodate such a firm and unimpeachable relationship.

■ ■ In a rate proceeding utility expenses, to be allowable, must be justified. Good company management is required; honest stewardship is demanded; diligence is expected; careful, even hard, bargaining in the marketplace and at the negotiation table is prerequisite. And so it must be with regard to expenses recaptured by "flow through" to consumers by dint of a comprehensive adjustment clause. Tested in the scrutiny of final rate determination[21] and only in that way (despite the impressive monitoring devices built into the instant clause) can such expenses be validated and become demonstrably honest components in the ascertainment of "just and reasonable" rates. Lacking that validation, certainty and justification, the rates would have been unjustly charged and to the extent of that injustice must be refunded to the customers. That protection being provided in unmistakable terms, however, we would see no reason for this Court to disagree with the PUC adoption and the continued operation of the comprehensive adjustment

[21]Described (except for its chronology) as a "crucible of a record hearing with opportunity for Rate Counsel and other parties to be heard" by Public Utility Commissioner Jacobson in his dissent in the December 26, 1974, PUC Decision, *supra*.

clause, pending, as we say, scrutiny of such expenses in final hearing. The *Sand Rate* case, *supra,* mentions examples of such explicit protective orders which have been adopted by PUC in the past.[22]

To resolve any imprecision in the record as it stands, and to avoid any possible question, we direct that PUC shall implant such certitude in the record. Assuming that to have been done, we determine that the comprehensive adjustment clause is valid, thus being subjected to the ultimate scrutiny of its yield in the manner we have described, so that the parties, the utility as well as its public customers, can be assured in unmistakable terms of the fact that they have been fairly and justly treated, and that the operating expenses the customers have been called upon to pay were wholly justified.

■ This assurance of scrutiny in final adjudication would also meet another point raised by rate counsel, namely the propriety of applying a comprehensive adjustment clause to *pro forma* rates. On the assumption of the entry of a protective order as mentioned above, we see no possibility of error bearing a potential of harm to the public, and not rectifiable in the final stage.

As modified by the directions contained herein, therefore, we affirm the Orders entered by PUC in December 1973.

PASHMAN, J. (dissenting). This case concerns the validity of orders promulgated by the Board of Public Utilities

---

[22]That should the Board ultimately determine that the temporary increase in revenues is excessive and not warranted, the Company will refund to its gas customers to whom said increases may be charged all or such part of said increase as the Board shall subsequently determine. [*In re Matter of Public Service Electric & Gas Co.*, 36 *PUR* 3d 135 (1960)]

On the other hand, if we grant immediate interim relief and it should be finally determined that all or part of such increases were excessive, we can and will rectify such results in fixing permanent rates at the conclusion of these proceedings by providing refunds to customers. [*In re Jersey Central Power & Light Co.*, PUC Docket No. 698–540, June 25, 1970]

Commissioners (PUC) on December 13, 1973 and December 20, 1973. These orders incorporated into the tariffs of respondent New Jersey Bell Telephone Company a so-called "comprehensive adjustment clause," permitting the telephone company to increase its rates in response to certain increases in operating expenses without the necessity of a proceeding under *N. J. S. A.* 48:2–21.

The majority has fully recounted the history of this matter before the PUC. In response to a rate increase petition filed by Bell, the PUC conducted a full rate proceeding, culminating in an order dated December 29, 1972, and a supporting opinion in which the Board made findings as to the rate base and operating expenses of the telephone company and determined a proper rate of return. In its order, the PUC also announced its intention to consider on its own motion whether telephone company tariffs ought to include a clause permitting certain increases in operating expenses to be automatically passed through as they arise to telephone customers. On December 13, 1973, after a series of hearings at which all concerned parties had an opportunity to present evidence and arguments, the PUC issued a further order authorizing inclusion in Bell tariffs of such an adjustment clause.[1] It is this order and the order of December 20, 1973, accepting the amended tariffs submitted by Bell pursuant to the December 13 order, which are the subjects of the present appeal.

I

Except in the limited classes of cases prescribed in *N. J. S. A.* 48:2–21.1 and *N. J. S. A.* 48:2–21.2, the PUC may not approve a rate increase without conducting a full rate pro-

---

[1] The order was broader in its effect. In addition to making specific findings and orders applicable to N. J. Bell, PUC also set out the terms of an automatic adjustment clause which any telephone company could incorporate into its tariffs and established a procedure for Board approval of such provisions.

ceeding pursuant to *N. J. S. A.* 48:2–21. *In re Intra-state Industrial Sand Rates,* 66 *N. J.* 12 (1974) ; *In re N. J. Power & Light Co.,* 15 *N. J.* 82 (1954) ; *Public Service Coordinated Transport v. State,* 5 *N. J.* 196 (1950). Such a proceeding involves notice to interested parties, public hearings, and a written order supported by findings of fact made on the record. The matters to be considered in such a proceeding are now well established:

> The justness and reasonableness of a particular rate of fare can only be determined after an examination of a company's property valuation which constitutes its rate base; its expenses, including income taxes and an allowance for depreciation; and the rate of return developed by relating its income to the rate base. [*Public Service Coordinated Transport v. State, supra* at 216].

An automatic adjustment clause which permits rate increases without public hearings and appropriate findings on the record is beyond the power of the PUC under *N. J. S. A.* 48:2–21. The Court has recently had occasion to specifically condemn similar attempts to circumvent the requirements of this statute in *In re Intrastate Industrial Sand Rates,* 66 *N. J.* 12 (1974). In that case, the PUC approved a new schedule of tariffs for carriage of certain categories of freight proposed by the Central Railroad Company of New Jersey, without establishing a rate base or rate of return, merely on the conclusory finding that "The Board is satisfied that the proposed rates which have been found reasonably compensatory herein are just and reasonable * * *." 66 *N. J.* at 17. The Court, in an opinion by the Chief Justice, properly rejected this procedure, explaining:

> The theory that in emergent circumstances, such as caused by the inflationary impact of rising labor and material costs on operations, there could sometimes be a valid rate increase, on a permanent basis, without exploring the rate base and considering the consequent rate of return thereon * * * has long since been discarded. [66 *N. J.* at 23; citations omitted].

*Accord, In re N. J. Power & Light Co.,* 15 *N. J.* 82 (1954) ; *Central R.R. Co. of N. J. v. Dept. of Public Utilities,* 7 *N. J.*

247 (1951); *Public Service Coordinated Transport v. State,* 5 *N. J.* 196 (1950); *Hudson & Manhattan R.R. Co. v. Bd. of Pub. Utility Com'rs.,* 16 *N. J. Super.* 396 (App. Div. 1951).

The principal argument of the telephone company in the present case is not that the adjustment clause is a valid rate-making procedure under *N. J. S. A.* 48:2–21, but rather that it is valid under *N. J. S. A.* 48:2–21.1, one of the exceptions to the general rate-making statutes.

It is now well established that *N. J. S. A.* 48:2–21.1 is not an independent basis for rate making by the PUC. It is designed simply to provide interim relief to utilities while rate increase petitions filed pursuant to *N. J. S. A.* 48:2–21 are pending. *In re N. J. Power & Light Co.,* 15 *N. J.* 82, 96–97 (1954). Rate increases granted pursuant to this statute are temporary and conditional and ultimately merge with the final order in the pending case. In *Sand Rates, supra,* the Court described the character of increases granted under this limited statute:

The vital justification for the "negotiation statute" and rates established under it, temporarily bypassing the establishment of rate base and fair rate of return, rests upon the legal umbilical cord which ties them to the anticipated eventual determination of these fundamentals; at which time the temporary rates, their legitimacy having been validated, merge into the PUC judgment ordaining the final rate structure or, if and to the extent found to have been excessive, are refunded to the consumers who paid them. Such interim relief permits the utility to escape the unfair and sometimes confiscatory impact of "regulatory lag," *i. e.,* the considerable time necessary for final resolution (perhaps after the exhaustion of appeals to the courts after a complex full-blown "rate case") of a rate increase predicated upon the justice and reasonableness, in the context of rate base, of a rate of return on its investment. In practice, PUC makes it clear that such increase is temporary and conditional * * *. [66 *N. J.* at 25].

The adjustment clause incorporated into Bell tariffs by the present orders was not intended as an interim measure pending disposition of a rate increase petition under *N. J. S. A.* 48:2–21. At the time the orders were promulgated,

no such petition was pending before the PUC.[2] The period of operation of the adjustment clause was not tied to any rate proceedings but was simply set at one year, renewable each year, subject to the approval of the PUC. No provision was made for review of such rates in the course of any subsequent full rate proceeding nor for refund of any excessive

[2]The majority seeks to avoid this conclusion by finding that the rate proceedings culminating in the December 29, 1972 order were still pending as of December 13, 1973. In a formal sense this is, of course, true. The PUC did treat the proceedings concerning the proposed automatic adjustment clause as a continuation of the prior case and also in its order expressly reserved questions raised by rate counsel concerning overall rate structure and design for further proceedings. The analysis of the majority, though, entirely misconstrues the function of *N. J. S. A.* 48:2–21.1, and exalts form over substance.

As discussed in the text, the purpose of rate making under *N. J. S. A.* 48:2–21 is to provide interim relief pending determination of a rate increase petition. In connection with its December 29, 1972 order, the PUC made the findings as to rate base, expenses, and rate of return required by *Public Service, supra*, granted a rate increase, and in fact disposed of all the issues raised by Bell in its rate increase petition. It expressly characterized its order as "final" with respect to those issues. In substance, no rate increase petition was pending after that date. What remained before the PUC were collateral matters raised during the course of the proceedings by rate counsel and the question of the adjustment clause raised by the Board itself. Nothing has been brought to the attention of the Court, either within the record or outside it, to indicate that the parties have continued to pursue before the PUC the questions raised by rate counsel and reserved by the Board. These questions concern *not the level of rates but their overall structure and design*. It would appear that the PUC does not contemplate that any orders it might make on these questions, if they are actually pursued, will affect its completed determinations as to the amount of total overall revenues to which Bell is entitled. Under these circumstances, it is difficult to see how an interim order under *N. J. S. A.* 48:2–21.1 could possibly be appropriate. It is of interest that when the telephone company subsequently decided that it needed greater revenues, it did not seek relief in the allegedly "pending" proceeding but instituted a new and separate rate proceeding.

It need hardly be pointed out that insofar as the majority's analysis relies on the proceedings involving consideration of the adjustment clause, its argument is hopelessly circular.

charges.[3] The rationale of the adjustment clause, as expressed by the PUC itself, was not one of *ad interim* relief during the pendency of a rate increase petition, but one of providing a mechanism for rate increases alternative to full rate proceedings. Thus in its order of December 29, 1972 the PUC declared:

Based on past practice, the Board could allow a fixed dollar amount of rate relief which would provide the financial needs over a reasonable future period. The Board, however, with the adoption of the adjustment clause could allow a smaller current amount plus the adjustment clause because the closer matching of operating costs and allowable revenues would be advantageous to the consumer, who would face more gradual increases in his charges for service. Customers, who bear the cost burden of rate matters, would further benefit from a decline in the number of proceedings.

This language was repeated in the order of December 13, 1973. In that order, the PUC also described the purpose of the adjustment clause as "during periods of rising costs, to allow smaller increases at shorter intervals, and thus avoid the time and expense of larger rate cases."

These facts clearly demonstrate that the adjustment clause involved in the December 13 and December 20 orders cannot be reconciled with the construction of *N. J. S. A.* 48:2–21.1 which the Court has consistently adopted. *In re Intrastate Industrial Sand Rates,* 66 *N. J.* 12 (1974); *In re N. J. Power & Light Co.,* 15 *N. J.* 82 (1954).

---

[3]The majority suggests that this defect has been retroactively remedied in the Board order of December 26, 1974, extending approval of the adjustment clause through 1975. Since this order is not before us on the present appeal it is, of course, improper to comment on its possible validity or invalidity. *Public Service Coordinated Transport v. State,* 5 *N. J.* 196, 226–27 (1950). Since the majority places some reliance on it, it may, however, be worth noting that this order is on its face not part of the same proceeding as the orders under review, but is cast as an interim order issued in connection with a rate increase petition filed by Bell on July 18, 1974. In that proceeding the Board may not order refunds for prior excesses, *In re N. J. Power & Light Co.,* 15 *N. J.* 82 (1954), as the majority seems to require.

The majority proposes, as an alternate rationale for sustaining the authority of the PUC under *N. J. S. A.* 48:2–21.1 to issue these orders, that the phrase "or at any other time" in the statute permits the adoption of an automatic adjustment clause even absent the pendency of a rate increase petition. *Ante* at 492. If by this proposal, the majority means that the PUC may at any time approve rate increases without notice, hearings, findings of fact, or any of the other incidents of rate making which this Court has in the past held to be essential for the protection of the public, subject only to a vaguely defined duty to hold a full rate proceeding every now and again, we are truly working a revolution today in utility regulation. This was precisely the regulative strategy undertaken by the PUC in *Sand Rates*, which this Court emphatically rejected but a few months ago.

While the legislative intent behind the phrase "at any other time" is not altogether clear, a reading of the statute in the broader context of the legislative scheme for utilities regulation suggests that the Legislature contemplated that the PUC would be able to grant interim relief in connection with rate petitions soon to be filed or temporarily out of the Board's jurisdiction much as the courts grant temporary restraining orders and emergent relief. *E. g., R.* 2:9–7, *R.* 2:9–8, *R.* 4:52–1.

## II

The basic purpose of all utilities regulation is to insure that public utilities, which have monopoly power and are thus beyond the reach of conventional market controls, do not exploit that monopoly power to extort excessive charges from their customers. "The public is not to be laden with unreasonable or extortionate rates in order that dividends may be provided for the utility's stockholders." *Atlantic City Sewerage Co. v. Bd. of Pub. Utility Com'rs.,* 128 *N. J. L.* 359, 366 (Sup. Ct. 1942), aff'd 129 *N. J. L.* 401 (E. & A. 1943). Nor is the public to be made to pay for the con-

sequences of lazy or inefficient management. *See N. J. Central Traction Co. v. Bd. of Pub. Utility Com'rs.*, 96 *N. J. L.* 90 (Sup. Ct. 1921). It is these general concerns that have motivated the Legislature in its adoption of the present statutory provisions for utility regulation. We must be guided by these same general principles.

The Legislature has sought to protect the public against depredations by utility companies by requiring that rate increases not be approved by the PUC without public hearings conducted upon a record. Despite the inadequacies of such procedures, the public's surest safeguard lies in searching public examination of the factual bases for requested rate increases in proceedings before the PUC, conducted with the assistance of rate counsel.

It would, of course, be self-defeating to insist that this admittedly time-consuming and ponderous procedure be required for setting of interim rates pending disposition of a rate increase petition, and the Legislature has not done so. In providing a more informal mechanism for interim rate increases, though, the Legislature has not left the public wholly to the mercy and benevolence of the utilities. Rather, in *N. J. S. A.* 48:2–21.1 it provided alternate, albeit less effective, safeguards:

1) such rates are made only in connection with specific pending full rate-making proceedings at which the effects of excessive interim orders may be corrected;

2) such rates are temporary and remain in force over only a very short period of time;

3) such rates must be the result of specific "negotiation and agreement" between the utility and the PUC.

The last requirement does not contemplate that the PUC may establish a policy of automatically approving requested rate increases. Instead, it demands that the Board affirmatively act on each proposed increase to evaluate its merits and to negotiate with the utility to protect the interests of the consuming public.

In general, automatic adjustment clauses are suspect if adopted under *N. J. S. A.* 48:2–21.1; for they have the potential to undermine the protection of the requirement that each rate increase be "negotiated" in that they permit pass-through of classes of alleged cost increases without effective review by the PUC. The more broadly and vaguely defined the classes of costs which may be passed on to utility customers, the greater the potential conflict between such adjustment clauses and the "negotiate and agree" language of the statute.

While I would hold that no automatic adjustment clause could be adopted pursuant to *N. J. S. A.* 48:2–21.1 even for purposes of interim relief pending determination of a rate increase petition, if the majority upholds such a clause, it must be drawn narrowly to comply with the spirit of that statute. At a minimum, I would require that the categories of cost increases for which automatic pass-through is permitted be strictly limited:

1) the type and amount of the cost must be truly beyond the control of the utility;

2) there must be objective standards by which the reasonable necessity of the type and amount of the cost can be determined with certainty.

The "comprehensive adjustment clause" authorized by the PUC orders of December 13, 1973 and December 20, 1973 permits the telephone company to pass on to its customers portions of increases in its operating expenses attributable to

1) salaries and wages, including fringe benefits,

2) depreciation expense,

3) other expenses, a catch-all classification, and

4) taxes, including federal income taxes, real estate taxes, revenue taxes, and social security taxes.

The Board chose these categories because it concluded that they covered substantially all or most of Bell's operating expenses. Despite the PUC's efforts to build some safeguards into the clause, I could not reconcile the use of such vague

and all-encompassing categories with the "negotiate and agree" requirement of *N. J. S. A.* 48:2–21.1, even if the adjustment clause were properly adopted as an interim measure under this statute.

My concern with the conflict between the "comprehensive adjustment clause" and the language of *N. J. S. A.* 48:2–21.1 is not inspired by mere literal-mindedness. The use of overly permissive automatic adjustment clauses enhances the risk that utility companies will, out of laziness or greed, extract unreasonable charges from the public. This is a problem to which we must be alert, even where, as in this case, there is no evidence that this utility can be charged with such behavior.

First, such arrangements reduce the incentive for a utility to bargain vigorously for the goods and services which it purchases. *See, e. g., FPC v. Sunray DX Oil Co.*, 391 *U. S.* 9, 25–26, 88 S. Ct. 1526, 20 L. Ed. 2d 388 (1968); *Permian Basin Area Rate Cases*, 390 *U. S.* 747, 793–794, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968). Even fuel adjustment clauses, which the majority and the PUC appear to take for granted (although they have never been considered by the courts of this State), have been questioned in some jurisdictions on this ground. *Union Electric*, 92 *P. U. R.* 3d 254 (Mo. Pub. Serv. Com. 1971); *cf. Southern California Edison Co.*, 94 *P. U. R.* 3d 252 (Cal. PUC 1972).[4] This ap-

---

[4]The principal policy arguments against the use of an automatic fuel adjustment provision are summarized in *Southern California Edison Co., supra* at 257–58:

(1) It represents an abdication of the commission's regulatory function; (2) it denies the ratepayer the opportunity to participate in a public hearing and to develop a full and complete record; (3) it has an inflationary effect on the economy; (4) frequent rate changes would result and this is undesirable; (5) there would be no incentive for the utility to attempt to obtain an economical supply of fuel nor to increase efficiency and absorb all or part of fuel cost increases; (6) it ignores other rate-making factors usually considered by the commission in spreading rates, such as competition, characteristics of use, and public benefit; and

plies generally to goods and services purchased from third parties; it applies with additional force to goods and services purchased from interrelated parties, a problem of special importance in the telephone industry, *cf. N. J. Bell Telephone Co. v. Bd. of Pub. Utility Com'rs.*, 12 *N. J.* 568, 591–92 (1953), *General Telephone Company of Upstate New York, Inc. v. Lundy*, 17 *N. Y.* 2d 373, 271 N. Y. S. 2d 216, 218 *N. E.* 2d 274 (N. Y. Ct. App. 1966), and to wages arrived at by collective bargaining, since wage negotiations are often conducted with a conscious eye toward management's ability to pass wage increases on to its customers.

Second, such arrangements, since they oblige the PUC to rely on the uncorroborated assertions of the utility, tend to put the public at the mercy of the utility's accounting practices. This Court has long cautioned against excessive reliance on the books of utility companies in rate proceedings:

The dangers inherent in accepting the books of account at face value in a rate proceeding are apparent. The prescription of a uni-

(7) it segregates and places emphasis on only one factor in setting rates, fuel cost, and ignores possible savings and efficiencies that have occurred in other portions of the utility's operation.

Over a strong dissent, the California Public Service Commission did approve the inclusion of a fuel adjustment, but surrounded its use with stringent safeguards.

Similar policy objections were expressed by Commissioner Jacobson in his dissent to the December 26, 1974 order of the PUC extending the "comprehensive adjustment clause" through 1975:

The Comprehensive Adjustment Clause prevents the PUC from properly evaluating the validity of such utility cost factors as depreciation, taxes, labor and other expenses before passing them on to the ratepayers.

To permit the automatic pass-through of these costs by mere computer-like calculations — even if agreement could be reached on a number of complex indices which are to be employed as the basis for such calculations — is an abandonment of the authority delegated to the PUC to regulate our state's utilities. In my opinion, retention of the Comprehensive Adjustment Clause impairs the due process upon which sound regulation depends. Proposed rate increases should be tested in the crucible of a record hearing with opportunity for Rate Counsel and other parties to be heard.

form system of accounts by regulatory commissions, such as the Board of Public Utility Commissioners, has been uniformly accompanied by the qualification that in prescribing the system of accounts, the commissioners do not commit themselves to the approval or acceptance of any item set out in any account for the purpose of fixing rates or in determining other matters before the commission.

Neither this Court nor the Board can accept the books of account of a public utility at face value in a rate case in which reasonableness is always the primary issue. * *' * It must be emphasized that rate making is not an adversary proceeding in which the applying party needs only to present a *prima facie* case in order to be entitled to relief. There must be proof in the record not only as to the amount of the various accounts but also sufficient evidence from which the reasonableness of the accounts can be determined. * * *

Lacking such evidence, any determination of rates must be considered arbitrary and unreasonable. [*Public Service Coordinated Transport, supra* at 218–19].

*Accord, Hudson & Manhattan R. R. Co. v. Bd. of Pub. Utility Com'rs.,* 16 *N. J. Super.* 396 (App. Div. 1951). This is particularly true where taxes and depreciation are involved.

In computing its annual tax expenses, a utility is of course subject to restrictions imposed upon it by the various taxing authorities. *See, e. g., FPC v. Memphis Light, Gas, Electric, & Water Division,* 411 *U. S.* 458, 93 S. Ct. 1723, 36 L. Ed. 2d 426 (1973). Nevertheless, the precise amount of taxes and rate at which those taxes accrue is subject to wide variations depending upon the utility's accounting practices. *See, e. g., In re N. J. Power & Light Co.,* 9 *N. J.* 498, 528–29 (1952); *FPC v. United Gas Pipe Line Co.,* 386 *U. S.* 237, 87 S. Ct. 1003, 18 L. Ed. 2d 18 (1967); *Southern New England Telephone Co. v. Pub. Util. Com'n.,* 29 *Conn. Super.* 253, 282 *A.* 2d 915 (Conn. Super. Ct. 1970). The amount of taxes shown on the company's books may not be the amount which ought to be reflected in utility rates. *FPC v. United Gas Pipe Line Co.,* 386 *U. S.* 237, 87 S. Ct. 1003, 18 L. Ed. 2d 18 (1967); *San Francisco v. Pub. Util. Com'n.,* 6 *Cal.* 3d 119, 98 Cal. Rptr. 286, 490 *P.* 2d 798 (Cal. Sup. Ct. 1971); *Colorado Municipal League v. Pub. Util. Com'n.,* 172 *Colo.* 188, 473 *P.* 2d 960 (Colo. Sup. Ct. 1970).

508

Depreciation is purely an accountant's fiction, although a reasonable and useful one, *cf. Public Service Coordinated Transport v. State,* 5 *N. J.* 196 (1950). The amount of depreciation that appears on the company's books may vary widely depending upon wholly discretionary decisions made by the company's accountants. Precautions must be taken to insure that such variations are not reflected in utility rates. *E. g., In re Wilmington Suburban Water Corp.,* 58 *Del.* 494, 211 *A.* 2d 602, 607 (Del. Sup. Ct. 1965); *Pittsburgh v. Pennsylvania Pub. Util. Com'n.,* 187 *Pa. Super.* 341, 352–357, 144 *A.* 2d 648, 655–57 (Pa. Super. Ct. 1958).

### III

Justice Holmes, not wholly in jest, once defined "great" cases as those that "deal with the Constitution or a telephone company."[5] The present matter has indeed been presented to the Court as a "great" case. We have been warned of the certainty of dire consequences if Bell is not permitted the benefits of the "comprehensive adjustment clause." History demonstrates that such predictions of imminent doom are rarely justified.[6] We must be wary of yielding to what Justice Holmes, writing quite seriously, described as the "hydraulic pressure" of such "great" cases, "which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." *Northern Securi-*

[5] O. W. Holmes, Jr., "John Marshall" quoted in Freund, "Foreword: On Presidential Privileges," 88 *Harv. L. Rev.* 13, 34 (1974).

[6] *See, e. g., Justice McReynolds'* dissent in *Gold Clause Cases,* 294 *U. S.* 240, 381, 55 S. Ct. 407, 427, 79 L. Ed. 885 (1935): "Loss of reputation for honorable dealing will bring us unending humiliation; the impending legal and moral chaos is appalling." In delivering the opinion from the bench the Justice sounded the trumpets of doom even more clearly: "Shame and humiliation are upon us now. Moral and financial chaos may confidently be expected." Quoted in Freund, "Foreword: On Presidential Privileges," 88 *Harv. L. Rev.* 13, 35 n. 112 (1974).

*ties Co. v. United States,* 193 *U. S.* 197, 401, 24 S. Ct. 436, 438, 48 L. Ed. 2d 679 (1904) (Holmes, J. dissenting).

In today's decision we abandon principles of utilities regulation which are not only sound but which we expressly reaffirmed earlier this term in *In re Intrastate Industrial Sand Rates,* 66 *N. J.* 12 (1974).

I am obliged to dissent.

*For affirmance as modified*—Chief Justice HUGHES, Justices JACOBS, HALL, SULLIVAN and CLIFFORD and Judge KOLOVSKY—6.

*For reversal*—Justice PASHMAN—1.